ACCEPTED
03-14-00440-CV
3930522
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/28/2015 12:15:54 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00440-CV

IN THE COURT OF
APPEALS THIRD JUDICIAL
DISTRICT AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/28/2015 12:15:54 PM
JEFFREY D. KYLE
Clerk

NANCY MARIE PECK,
Appellant,

V.

WAYNE CODY PECK,
Appellee.

Appealed from the County Court at Law No. 4
Williamson County, Texas

APPELLEE'S BRIEF

**Attorney for Appellee**
Felix Rippy
Texas Bar No . 16937400
RIPPY & TAYLOR, PC
3000 Joe DiMaggio Blvd.
Ste. 4
Round Rock, Texas 78665
Tel: (512) 310-9500
Fax: (512) 310-2580
Email : felixrippy@aol.com

APPELLEE REQUESTS ORAL
ARGUMENT

## NANCY MARIE
## PECK,
## Appellant,

## v.

## WAYNE CODY PECK,
## APPELLEE.

---

### IDENTITY  OF PARTIES  &
### COUNSEL

---

Nancy Marie Peck, Appellant herein, brought this appeal seeking relief from the Third  Court of Appeals . In order that the  Court may determine disqualification and recusal under Rule 16 of the Texas Rules of Appellate Procedure , Appellee Wayne Cody Peck certifies the following is a complete list of the parties , attorney, th e trial court judge, and any other person w ho had an interest in the outcome of the underlying  lawsuit.

**Appellant**
Nancy Marie Peck
Petitioner in 13-0926-FC4

**Appellee**
Wayne Cody Peck
Respondent in  13-0926-FC4

**Attorney for Appellant**

John J. Hindera , J.D., Ph.D.
Texas Bar No. 24037682
THE HINDERA LAW FIRM

4425 S. MoPac
Expressway Building 2 ,
Suite 107
Austin , Texas
78735 Tel: (512)
899-3631
Fax:  (512) 899-3618
Email: john@
hinderalaw.com

**Attorney  for Appellee**
Felix  Rippy
Texas Bar No . 16937400
RIPPY & TAYLOR, PC
3000 Joe DiMaggio Blvd., Ste. 4
Round Rock, Texas 78665
Tel:   (512) 310-9500
Fax:  (512) 310-2580
Email :
felixrippy@aol.com

# TABLE OF CONTENTS

IDENTITY OF PARTIES &
COUNSEL..................................................................................................2

TABLE OF CONTENTS ...................................................................... 4

INDEX OF AUTHORITIES ................................................................. 5

STATEMENT OF THE CASE ............................................................. 7

ISSUES PRESENTED ........................................................................... 8

STATEMENT OF FACTS .................................................................... 9

SUMMARY OF THE ARGUMENT ................................................... 11

ARGUMENT

Issue 1:    The trial court abused its discretion by holding against the great weight of the evidence that Appellant's ability to provide for her minim u m reasonable needs is not substantially or totally diminished because of a physical or mental disability.....................................................................................................................10

Issue 2:    The trial court abused its discretion by not requiring Appellee to prove by clear and convincing evidence that a certain monies are effectively separate property......................14

PRAYER ............................................................................................... 24

CERTIFICATE OF SERVICE ........................................................... 18

APPENDIX

Entirety of Volume 2 of the Court Reporter's Record ..................................
.................EXHIBIT A

Entirety of Volume 3 of the Court Reporter's Record ......................
.................EXHIBIT B

Entirety of Volume 9 of the Court Reporter's Record
.................................................................EXHIBIT C

## INDEX OF AUTHORITIES

**CASES**
Nelson v. Najm, 127 S.W.3d 170, 174 (Tex.App.-Houston [1st Dist.] 2003, pet. denied)    ........13

City of Keller v. Wilson, 168 S.W.3d 802 (Tex. 2005) .......................................
....................13

*McCann v. McCann,* 22 S.W.3d 21, 24 (Tex.App.-Houston [14th Dist.] 2000, pet. denied)....13

*McKinley v. McKinley*, 496 S.W.2d 540, 543 (Tex. 1973)........................................................ 13

Stavinoha v. Stavinoha, 126 S.W.3d 604, 608 (Tex.App- Houston [14thDist.] 2004) ........................................................................................ 15

*Estate of Hanau v. Hanau,* 730 S.W.2d 664, 666-67 (Tex. 1987); *Carter v. Carter,* 736 S.W.2d 775, 777-80 (Tex. App.–Houston [14th Dist.] 1987, no writ); *Holloway v. Holloway,* 671 S.W.2d 51 (Tex. App.–Dallas 1983, writ dism'd); *Huval v. Huval,* 2007 WL 1793771 (Tex. App.–Beaumont 2007, no pet.)....................................................................................
....................17

*In re J.D.D.*, 242 S.W.3d 916, 920 (Tex. App.—Dallas 2008, pet. denied). Iliff v. Iliff, 339 S.W.3d 74, 80 (Tex. 2011) (disapproving of *DuBois v. DuBois,* 956 S.W.2d 607 (Tex. App.—Tyler 1997, no pet.) (citing *Murff v. Murff,* 615 S.W.2d 696, 700 (Tex. 1981)........................................................................18

**RULES**
None

**STATUTES**

TEX. FAM. CODE § 8.051 ........................................................................ 10

TEX. FAM. CODE § 8.051(2)(A) ....................................................... 12

TEX. FAM. CODE §
3.003(a)........................................................................................ 16

# STATEMENT OF THE CASE

This is an appeal from a divorce lawsuit without children. After a two-day bench trial, and after a prior temporary orders hearing as well, the court found that Appellant should be "limited" to FIVE years of alimony after the divorce. The Court also ruled that Appellee should be awarded 100% of the monies in a Morgan Stanley account regardless of the account's characterization. Those were the only disputed issues presented to the trial court. The rest of the property was divided by stipulation in proposed support decisions that the Trial Court saw but that are not part of this record.

# ISSUES PRESENTED

Issue 1: Appellant contends in their 12-30-14 brief that the trial court abused its discretion by holding against the great weight of the evidence that Appellant's ability to provide for her minimum reasonable needs is not substantially or totally diminished because of a physical or mental disability. This is a strange contention since Appellant was actually awarded 5 years of alimony with absolutely no evidence in the record of property awarded to her being "insufficient income" or of "minimum reasonable needs."

Issue 2: Appellant contends that the trial court abused its discretion by not requiring Appellee to prove by clear and convincing evidence that a certain single account was "effectively separate property." Also a strange contention since there is no evidence in the record of the value of awards of any other property and in fact those awards were stipulated.

## STATEMENT OF FACTS

Appellant and Appellee were married on June 24, 1989, and Appellee graduated from the U.S. Military Academy thereafter serving his country and rising to the rank of Major. At all times relevant to the underlying divorce lawsuit, Appellee was an officer in the United States Army.

In approximately 2002, Appellant argues that she became "unable to work at her chosen profession" as a registered nurse because of several chronic physical illnesses and mental disorders. Actually she was fired and began abusing prescription drugs, as the Court determined. This choice to engage in prescription drug abuse, along with Appellant's ability to do any number of jobs competently, continues to the present day.

Ten years after she quit working, in 2011, Husband/Appellee filed for divorce, generously delaying the final hearing in the case until two full years after the temporary orders were issued, the sole purpose of this VOLUNTARY DELAY'S being to provide for Appellant/Wife the very useful 20/20/20 lifetime Tri-Care medical care available to spouses of retired military personnel. Instead of showing gratitude, Appellant took advantage of Appellee's paying the mortgage on the empty personal residence and simply lived elsewhere (in her

parents' "winter home") to taunt Appellee/Husband. Appellant/Wife also constantly emailed Appellee/Husband making incoherent demands for return of unnamed personal items, a 20 page list of which Appellant/Wife brought to Court and which the Judge summarily denied. Ironically, the Appellant/Wife admits in her brief to this court that the February 20, 2012 mediated agreement essentially gave her everything she had asked for including ALL of her allegedly missing personal items and which AGREEMENT also prevented the divorce from being finalized until Wife/Appellant was fully qualified for Tri-Care - i.e. lifetime free medical insurance along with two years of temporary alimony. Also contrary to Appellant/Wife's rendition of the facts, and the attached record of testimony, Appellee never attempted to "set aside" the mediated agreement, and the Trial Court most certainly did not sympathize with Appellant/wife by rendering any orders that "held the parties to their agreement." If the Trial Court had "held the parties to their agreement," there would be no appeal--Wife/Appellant would not be appealing her own agreement, would she?

Also important in this case is the well know adage that the trial court gets to judge the credibility of the witnesses. What Appellant/Wife conveniently leaves out is that when the case came on to be heard in a bench trial on March 17-18,

2014, the trail court witnessed the miraculous physical recovery that Wife/Appellant seemed to have made since the temporary orders. Her in-Court histrionics laid waste to the Court's assessment of her veracity and simply nothing she said was believable. She had come to previous hearings in or with a wheelchair and now seemed to be "cured." Finally, the Appellant/Wife seems hung up on the peripheral and unimportant issue of exactly when the trial Court granted the divorce. The trial court most certainly did grant the parties their divorce on March 18, since the "subsequent hearing" counsel references as being held on May 8 of 2014 was a "motion to enter" which means of course "motion to enter judgment." Such a motion cannot be heard unless judgment had been granted, of course. Not that any of that is relevant of course, but it is typical of Appellant/Wife's pitiful attempts to obfuscate the real issues while continuing to malinger and avoid work–and to continue her prescription drug abuse.

## SUMMARY OF THE ARGUMENT

Wife/Appellant's first argument challenges the sufficiency of the evidence supporting the trial court's finding that she is not entitled to spousal maintenance. Of course the trial Court did award her 5 years of spousal

maintenance. What Wife/Appellant seems to mean is that she needs MORE alimony. To get to this point, Wife/Appellant must argue that the only evidence adduced at trial that she was not entitled to more spousal support was simply the Court's "court's experience with this particular mixture of medicine." Instead, however, there was abundant testimony-- over and above simply judging Wife's credibility through her awful and untruthful demeanor-- that she was not in any way entitled to more continuing support of her bad habits than the Court awarded. Wife/Appellant simply regurgitated over a thousand pages of medical records --none of which stated that she could not work. She offered no expert testimony on this subject whatsoever, except of course her own unbelievable testimony. The bottom line is that with NO evidence of the property values that wife was awarded in the record, the Court's generous 5-year award must either stand or NO alimony whatsoever is appropriate.

Wife/Appellant 's second argument is that Appellee 's evidence was grossly insufficient to support the trial court's award to him of the entirety of a certain Morgan Stanley/Smith Barney account. That is a peculiar argument since the Appellee introduced not only his own testimony but the actual probate

records showing his inheritance of this account in a LARGER amount of money than was in the account at the time of trial. If the Court had really ruled that this account was separate property, Husband/Appellee should be awarded substantial reimbursement, and indeed he would be upon a retrial. But the bottom line is that as with the alimony award, the division of property was largely agreed and there was thus no evidence in the record of who was awarded what. The record is clear that the division of property was so one sided in this case IN THE WIFE'S FAVOR, that when coupled with the generous agreement by Husband/Appellee to wait to divorce until lifetime medical insurance could be obtained for Wife/Appellant, husband was awarded the entirety of the account in question. There was no evidence put in the record of the values of any other property awarded, so the Appellate Court presumes the award to be just and right. Wife cannot agree to a one sided property division in her favor and now complain about it with no record.

ARGUMENT

Issue 1:    Appellant contends that the trial court abused its discretion by holding against the great weight of the evidence that Appellant's ability to provide for her minimum reason able needs is not

substantially or totally diminished because of a physical or mental disability. This is not the issue. The issue is whether the Court could grant 5 years of alimony as it did with no proof in the record of either income or needs of Wife nor value of any other property awarded to Wife. There simply is no basis for any award of alimony of any kind.

Appellant/Wife admits in her brief that she had at trial the burden of proof to show her need for post-marital alimony.[1] Appellant, however, misstates the test for receiving alimony in Texas. The eligibility requirements are a two-prong test. <u>The first prong deals with property and not with medical condition</u>. This first prong must be satisfied by any spouse to whom post divorce spousal maintenance is awarded: A court may only order payment of spousal maintenance if the spouse seeking maintenance will lack sufficient property, including the spouse's separate property, on dissolution of the marriage to provide for the spouse's minimum reasonable needs. TEX. FAM. CODE §8.051. This first prong means that the amount of property that a spouse receives affects the eligibility for alimony. This prong is the primary one at issue in this case...did the wife regardless of condition get enough property to meet her minimum reasonable needs? In this regard, first it should be noted that there was NO testimony offered by Wife as to what her "needs" actually

---

[1]Appellant states in her brief to the Court that she "is required to prove she is unable to earn sufficient income to provide for her minimum reasonable needs because of an incapacitating physical or mental disability." (Citing TEX. FAM. CODE § 8.051(2)(A).

were or as to the dollar amount of the property that she was awarded...and the burden is on her to do so. Wife was awarded 60% of the sale price of a house, but no value is ever assigned by Appellant to this house, nor to the accounts that were awarded 60% to Appellant as well. Vol. 2 at 24: 20-23; Vol. 3 at 43: 7-19. This is not due to some omission by counsel, but rather due to the fact that the property in this case was divided by agreement and stipulation. The only evidence in the record is that Wife had been receiving $2000 per month in support plus a $1500 mortgage payment since the two-year old temporary orders began, Vol. 2 at 27: 10-15, and she continues to receive after the divorce far more money per month than most Americans earn...Wife/Appellant admits that her continuing share of Appellee/Husband's retirement is "around" $1800 per month, Vol. 2 at 11: 1-5 and she then offers no further evidence of any kind of the amounts of money in any of the accounts she was awarded, or from the sale of the home that was ordered and occurred, although those amounts are so hugely substantial that the Court awarded to Appellee the $41,000 Morgan Stanley account also at issue in this case "regardless of its characterization." Vol. 3 at 43: 12-15  In addition to offering no evidence of the property she was awarded's values, it is uncontroverted that Wife offered no evidence of her needs. She was, however, awarded $2500 per month for two years, $2000 for 3 years, Vol. 3

at 44: 11-15, and there is no evidence whatsoever in the record that these amounts will not meet her minimum reasonable needs or even what the other amounts of property are that she is receiving. Of course, it is also uncontroverted that Appellant/Wife lives in her parents' "winter home" Vol. 2 at 65: 22. And "has paid" $39,417 in legal fees at the time of the trial. Vol. 3 at 41: 8. Appellant/Wife has substantial separate property assets, none of which were valued to the court, and she provided no proof of any of her needs nor of the amount of property she received in the community property division. Thus she is NOT entitled to alimony whatsoever, although she was awarded 5 years of it.[2]

So, Appellant/Wife fails the first prong of the alimony test. There just isn't evidence of her separate or community property's values or of her needs. Assuming for the sake of argument that she had passed this prong, and shown the values of what she was awarded failed to meet her needs, which she did not, her

---

[2]In fact, Wife/Appellant was actually awarded very close to her actual request of the court from a monetary standpoint compared to what she said she was seeking, which was as follows per Vol. 2 at 74: 7-13:

"Q. (By Mr. Hindera) You want 50 percent of the retirement -- the military retirement, correct?
A. Yes.
Q. And you want Wayne Peck then to make up the rest of that to get you to the level that you're at now?
A. To the 3,000.
Q. Yes, ma'am."

This exchange means that Appellant was only asking for $1200 per month, over and above the retirement that would be awarded to her, although the time period she was seeking it is rather indefinite as will be discussed below. Do these amounts meet her needs? There is no evidence. But she is asking for them so they must meet her needs, and the other property she was awarded meets this request by her.

eligibility for spousal maintenance depends upon whether she comes within the second prong of the test, which can be accomplished by proving one of the following two subsidiary additional prongs: subsidiary additional prong one is that if a spouse seeks maintenance based upon an incapacitating physical or mental disability, under TFC 8.051(2)(A), there is no requirement to overcome a rebuttable presumption against the award of spousal maintenance and the length of the marriage is immaterial to establishing eligibility for such an award. If eligibility is perfected under TFC section 8.051(2)(A), the court may render an order for spousal maintenance that continues for as long as the spouse continues to satisfy the eligibility criteria. As mentioned previously, of course, in a bench trial, the trial court is the sole judge of the credibility of the witnesses and may take into consideration all the facts and surrounding circumstances in connection with the testimony of each witness and accept or reject all or any part of that testimony. Nelson v. Najm, 127 S.W.3d 170, 174 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). So under subsidiary prong one Appellant would have had to carry her burden of showing an "incapacitating...disability."

If Appellant/Wife were not trying to show "incapacity," then she need only show subsidiary alimony prong number 2, which states that (if there is no incapacity) maintenance under Section 8.051(2)(B) is not warranted unless the

spouse seeking maintenance has exercised diligence in (1) earning sufficient income to provide for the spouse's minimum reasonable needs; or (2) developing the necessary skills to provide for the spouse's minimum reasonable needs during a period of separation and during the time the suit for dissolution of the marriage is pending. *See* TEX. FAM. CODE § 8.053. If the spouse seeking maintenance has not exercised diligence in either of the above, spousal maintenance will not be available. Even if available, under these facts, Appellant/Wife would be limited to 7 years of payments at most.          Unfortunately, as with the value of the property that Appellant/Wife was awarded, Appellee cannot tell what prong Appellant is even attempting to use to request alimony. At Vol. 2 at 10: 4-10 Appellant requests of the Court "7 years." So Wife is NOT arguing incapacity at this point. Her Counsel states that "she qualified for the seven years under the code." That means no incapacity. Appellant's Counsel further states with regard to spousal support, that he does not "think the Court can do it indefinitely." Vol. 2 at 9: 20-23. The Court plainly asks "And what she's wanting is for seven years to receive $3,000 a month. Is that correct? MR. HINDERA: Yes." Vol. 2 at 13: 17-20. On the very next page of the transcript, Counsel for Wife concedes that "I know this sounds draconian. The last offer on the table was 2,500. My client would like 3,000. And she's looked at her budget and I agree, Your Honor." Vol.

2 at 14: 1-4. So it would appear that Appellant/Wife is claiming not incapacity but rather the second subsidiary prong which is inability to earn and which requires attempts at job placement, which all concede she did not do. Vol. 2 at 65:17-20.

Presumably toward the end of proving either that she either had an incapacitating physical or mental disability (subsidiary prong one) or simply lacked the ability to provide for her "minimum reasonable needs," but sought jobs to do so (subsidiary prong two), Appellant simply dumped into the Trial Court's lap 1200 pages of medical records, which she admitted never stated in any record at any point that she was unable to work (i.e. incapacitated) Vol. 2 at 65 at 5-11. In fact Appellant/Wife's brief admits that a court would have to read between the lines to find any incapacity....stating on page 10 of said Appellant's brief that Appellant's disability could be "inferred from circumstantial evidence." Of course, the court, is the sole judge of the credibility of the trial witnesses is also free NOT to infer incapacity, if the Court so chooses, particularly where the Court hears abundant testimony about the 3 page list of prescription drugs and self-over-medication of Appellant (Vol 2 at 49-53) and concludes:

"Now , I do not find th at Mrs. Peck is disabled . I do find that she is on a very distressing combination of medicine. I do believe that that may be a factor in her employment possibilities as the currently exist. And it might do her well

to confer with one physician about her issues, because it's the Court's experience with this particular mixture of medicine causing problems in cases similarly situated to this one." Vo l. 3 at 44 :2-10.

Appellee agrees with Appellant at page 18 of her brief that there was absolutely no evidence introduced at trial regarding the effects of the prescription medicines taken by Appellant. The burden to show either subsidiary prong (incapacity or lacking ability to earn but still trying) is on Appellant. Both these subsidiary prongs require inability to "earn sufficient income to provide for the spouse's minimum reasonable needs." There is no evidence of Appellant's financial needs. Accordingly , the trial court's conclusion should have really been that there simply was not only no evidence of total incapacity, but also no way to tell what prong Appellant was even using to argue for alimony at all. Appellant admits that she is required to offer evidence and not only inference, as to either inability or as to needs...and unfortunately for Appellant inference is based on trial credibility of the witnesses and judged solely by the Trial Court.

In sum, regarding the first point of error alleged by Appellant, there is no evidence of any kind in the record indicating the precise value of anything awarded to Appellant—only that the values were quite large and stipulated. The responsibility for putting these values in the record is on Appellant. Even

if there were such indications in the record and if the property awarded to Appellant/Wife were somehow surmised to be insufficient to provide for her minimum needs, there is no evidence that Appellant either was "incapacitated" nor made any efforts to look for work. The Court awarded Appellant spousal support anyway, but there really is no foundation whatsoever for the award with no record of any value of the separate or community property that Appellant was awarded. Thus there is no foundation of any award of alimony at all, much less some kind of increase or whatever it is that Appellant is asking for here. Appellee contends that all awards of alimony should be stricken.

Issue 2:    Appellant contends that the trial court abused its discretion by not requiring Appellee to prove by clear and convincing evidence that certain monies are "effectively separate property." This is not the issue. The issue is whether Appellant can attack the award to Appellee of an account regardless of its character when no property values are in the record precisely because the property was divided by agreement.

Appellant and Appellee stipulated to the character and distribution of the marital assets, with the sole exception of a certain Morgan Stanley account that is the only account disputed in this Appeal. Appellee showed through certified probate records as well as testimony that this account was his separate property

because it only contained funds from an inheritance. These probate records are attached as the entirety of Vol. 9.

The character of marital property is a mixed question of law and fact. TEX. FAM. CODE § 6.711. Appellant admits that any community-property presumption in the law is rebutted when a party introduces evidence indicating that the property should be characterized as separate property. *McCann v. McCann,* 22 S.W.3d 21, 24 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). The party seeking to rebut the community-property presumption must present clear and convincing evidence or the property's separate character. TEX. FAM. CODE §3.003(b); *McKinley v. McKinley*, 496 S.W.2d 540, 543 (Tex. 1973). The clear and convincing standard requires evidence on which "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Stavinoha v. Stavinoha*, 126 S.W.3d 604, 608 (Tex.App- Houston [14th Dist.] 2004, no pet.). In addition to the Volume 9 probate records attached hereto, Appellee testified that "around $69,000" he received pursuant to his father's estate was held in the same Morgan Stanley account awarded to him by the Court. Vol. 3 at pages 16-17. Contrary to Appellant's assertion, Appellee introduced more than simply

the last will and testament of his father. Vol. 9 also includes the sworn inventory from that court proceeding showing this inheritance. It is also not true that there was any "contradictory" testimony regarding Appellee's inheritance. Spousal testimony that is uncontradicted is fully sufficient to constitute clear and convincing evidence and establish the character of the account property. Texas Commentators agree that different appellate courts have said different things about the importance of a spouse's testimony of separate property. The cases as a whole usually support the view that the uncorroborated testimony of a spouse is more than a scintilla of evidence to support a finding of separate property. The following cases upheld tracing of separate property assets through various accounts even though, in some instances some account statements were missing, and in other instances no account statements at all were offered into evidence:

*Estate of Hanau v. Hanau*, 730 S.W.2d 664, 666-67 (Tex. 1987); *Carter v. Carter*, 736 S.W.2d 775, 777-80 (Tex. App.–Houston [14th Dist.] 1987, no writ);

*Holloway v. Holloway*, 671 S.W.2d 51 (Tex. App.–Dallas 1983, writ dism'd);

*Huval v. Huval*, 2007 WL 1793771 (Tex. App.–Beaumont 2007, no pet.)

Finally, the division of property in this case was so one sided in FAVOR of Appellant that the Court found that:

"regardless of the classification of the property held in the Morgan Stanley account, I'm awarding it in its entirety to him. Regardless of the classification of the property contained in her account that she says is her separate property, I will award entirely to her."

The Appellant has the burden in the appeal of showing that the division of property is somehow unjust or unfair, and as with her claim for additional alimony, with no values in the record of anything awarded to anyone, the Appeals Court must presume that the division is just and right since only the trial court got to see the stipulated property division and proposed support decisions of the parties.[3]

## PRAYER

Appellant introduced no evidence at trial of the value of anything that she was awarded. Thus she is unable to meet her burden of showing that the property division leaves her unable to provide for her minimum reasonable needs. Moreover,

---

[3]When reviewing evidentiary sufficiency, we view the evidence in the light most favorable to the trial court's actions, indulging every presumption in favor of the judgment. *In re J.D.D.*, 242 S.W.3d 916, 920 (Tex. App.—Dallas 2008, pet. denied). Iliff v. Iliff, 339 S.W.3d 74, 80 (Tex. 2011) (disapproving of *DuBois v. DuBois*, 956 S.W.2d 607 (Tex. App.—Tyler 1997, no pet.) (citing *Murff v. Murff*, 615 S.W.2d 696, 700 (Tex. 1981) (in resolving issues within its discretion, the trial court is "empowered to use its legal knowledge and its human understanding and experience.")

no medical records of any kind indicating that she had any physical or mental disability that would prevent her holding a job and did not try to get a job. With no way to tell who was awarded what, this Court should reverse the trial court's order that awards any alimony whatsoever. Similarly, Appellee did not have to carry some burden of proof that the disputed account was his separate property...although he did so both through his testimony and through Volume 9 of the trial exhibits. Appellant failed to show the trial court any values whatsoever of anything that she was awarded, including her own separate property account, and so the trial court's order that awarded this disputed account to Appellee cannot be attacked now.

Respectfully submitted,

__/s/ Felix Rippy_____
Rippy & Taylor, PC
3000 Joe DiMaggio, Suite 4
Round Rock, TX 78665
(512)310-9550
felixrippy@aol.com

## CERTIFICATE OF SERVICE

I certify that on January 20, 2015 , a true and correct copy of the foregoing Appellee's Brief was served on Appellant , Nancy Marie Peck, by and through her attorney of record , John J. Hindera, by certified U.S. mail, return receipt requested , to 4425 MoPac South, Building 2, Suite 107, Austin, TX 78735 , and via email at

john@hinderalaw.com .

_____/s/ Felix Rippy_____

Felix Rippy, SBOT 16937400

## RULE 9.4(I)(3) CERTIFICATION

This document complies with the typeface requirements of Tex. R. App. P. 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Tex. R. App. P. 9.4(i), if applicable, because it contains 4861 words, excluding any parts exempted by Tex. R. App. P. 9.4(i)(1).

_____/s/ Felix Rippy_____

Felix Rippy, SBOT 16937400

# Exhibit A

REPORTER'S RECORD
VOLUME 2 OF 9 VOLUMES

CAUSE NO. 13-0926-FC4
COURT OF APPEALS NO. 03-14-00440-CV

| | |
|---|---|
| IN THE MATTER OF | * IN THE DISTRICT COURT |
| THE MARRIAGE OF | * |
| NANCY MARIE PECK | * WILLIAMSON COUNTY, TEXAS |
| AND | * |
| WAYNE CODY PECK | * COUNTY COURT AT LAW NO. 4 |

REPORTER'S RECORD

MARCH 17, 2014

FINAL HEARING

On the 17th day of March, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable John B. McMaster, Judge Presiding, held in Georgetown, Williamson County, Texas.

Proceedings reported by computerized stenotype machine.

APPEARANCES


MR. JOHN J. HINDERA, J.D., PH.D.
THE HINDERA LAW FIRM
SBOT NO. 24036782
4425 MoPac South
Building 2, Suite 107
Austin, Texas   78735
(512) 899-3631
(512) 899-3618 Fax
ATTORNEY FOR THE PETITIONER

MR. FELIX RIPPY
RIPPY, HENDERSON & TAYLOR, PC
SBOT NO. 16937400
3000 Joe DiMaggio, Suite 4
Round Rock, Texas   78665
(512) 310-9500
(512) 310-2580 Fax
ATTORNEY FOR THE RESPONDENT


ALSO PRESENT:

    Mr. Wayne Cody Peck
    Ms. Nancy Marie Peck

CHRONOLOGICAL INDEX

VOLUME 2 OF 9
(FINAL HEARING)

March 17, 2014                                     Page   Vol

Petitioner's Opening.........................  30     2

Respondent's Opening.........................  33     2

PETITIONER'S DIRECT EVIDENCE

| WITNESS | Direct | Cross | VD | Vol |
|---|---|---|---|---|
| Nancy Marie Peck.......... | 39,66 87 | 80 | 61 62 65 | 2 2 2 |
| Proceedings Recessed..................... | | | 88 | 2 |
| Reporter's Certificate................... | | | 89 | 2 |

ALPHABETICAL WITNESS INDEX

|  | Direct | Cross | VD | Vol |
|---|---|---|---|---|
| Nancy Marie Peck........... | 39,66 87 | 80 | 61 62 65 | 2 2 2 |

PETITIONER'S EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|-----|-------------|---------|----------|-----|
| 2 | Records (Claudio Ghio, L.P.A., L.S.S.P.) | 68 | 69 | 2 |
| 3 | Records (Austin Pain Associates, Jessica Horwath, PA-C) [Mistakenly referred to as Exhibit 6 in the Record] | 60 | - - | 2 |
| 20 | Records (Medical Clinic of North Texas P.A., Awilda M. Luciano, M.D.) [Mistakenly referred to as Exhibit 18 in the Record] | 56 | 56 | 2 |
| 21 | Records (Neuropsychology Services of Austin P.C., William A. Dailey, Ph.D.) | 50 | 51 | 2 |
| 22 | Records (Robert Burlingame, M.D. P.C.) | 58 | 58 | 2 |
| 23 | Records (Scott & White Healthcare) | 47 | 48 | 2 |
| 28 | Records - Mayo Clinic | 67 | XX | 2 |
| 29 | Latest Records (Claudio Ghio, L.P.A., L.S.S.P.) | 68 | XX | 2 |

PROCEEDINGS

MARCH 17, 2014

THE COURT: All right. Lawyers, this is Cause No. 12-0349 Peck. Can I have an announcement, please.

MR. HINDERA: Your Honor, John Hindera for Petitioner, Nancy Peck.

MR. RIPPY: And, Judge, Felix Rippy for Respondent, who is Major Wayne Peck.

THE COURT: All right. Will the parties please rise. Raise your right hands.

(Parties sworn by the Court)

THE COURT: All right. And I believe -- Mr. Rippy, are you Petitioner?

MR. RIPPY: Actually, I think Nancy Peck is the Petitioner.

THE COURT: All right. Mr. Hindera, I'd like an opening statement, please.

MR. HINDERA: Your Honor, this is a 24-year, maybe 25-year at this point marriage in June. The parties do not have any children who are before the Court. In that respect, it's a property case.

As you will see, this case began under some fairly egregious facts as far as my client is concerned, and we'll lay that out for the Court. Mr. Major Peck is

getting out of the military here in August. At this point, Ms. Peck is going to get her share of the retirement, but we don't know yet what he's going to do as far as the disability that he gets to claim, which then subtracts from the retirement. And they've been fiddling around with that law.

Now, I believe that we have agreed that the personal property, the community property, the spreadsheet that Ms. Peck has created --

THE COURT: Ms. Peck created this list?

MR. HINDERA: I've got the longer one, if you would like.

THE COURT: No, that's okay, Counsel. This is unique.

MR. HINDERA: And they've agreed that the personal property is hers, and then there is a common property that is community property. So the separate property is Ms. Peck's. The community property, Mr. Major Peck -- and I apologize -- Major Peck took from the house what he wanted. Certain items were left in the house, which we know now as of Saturday has an offer and acceptance to sell. But they've agreed that the common property, everything that's in that list goes to Ms. Peck.

We have agreed to a 60/40 split on the

proceeds of the house. There is a spousal support payment that hasn't been made for the 1st of March and the 15th of March yet by Major Peck. There's also a house payment that hasn't been made. And Ms. Peck would like to make sure that doesn't affect her credit.

There is a separate IRA that is Ms. Peck's that is nothing more than -- the only thing in there is what her parents have put in, and the account number ends in 0224. It is a Smith Barney account.

There is a disputed Smith Barney account that Mr. Peck -- Major Peck has, which started out at Morgan Stanley, but now it's at Smith Barney. They changed -- well, is it Smith Barney?

THE COURT: If I can get everybody -- I kind of want to narrow your focus here just if you would for a moment, Counsel.

MR. HINDERA: Okay.

THE COURT: What is in dispute?

MR. HINDERA: The only things that are in dispute is how much the spousal maintenance will be. We want a disability finding from this Court, and we're prepared to put in the records. Ms. Peck is asking for attorney fees. And we at least have -- there was a mediated settlement agreement to get to temporary orders. There were two attempts to set that aside here

in front of this Court. At a minimum, I think Ms. Peck is -- the Court should award $4,492 in those fees, but she would like a larger proportion of the total fees that she's paid here.

We've agreed that the frequent flier miles -- that there were 360,000 frequent flier miles -- 3,694 frequent flier miles. Mr. Major Peck moved those or used those or something, but he's agreed whatever is remaining there, he has represented it's about half, those will go to Ms. Peck.

There is a Survivor Benefit Program that she gets. And there's a 50 -- they're going to split the monthly fees 50/50.

There were two tax checks for 2011, 2012, and 2013. It has yet to be filed. Ms. Peck believes that total comes to 1726. And that's disputed.

THE COURT: Okay. So far we have that Ms. Peck wants the Court to find that she is disabled and order alimony for an indefinite period of time; is that correct?

MR. HINDERA: Well, I don't think the Court can do it indefinitely. The Court picks a time period, but then we come back.

THE COURT: I know what I can do. I'm wondering what you're asking me to do.

MR. HINDERA: I'm asking you to get to award spousal maintenance of a certain amount that will bring her up to $3,000 per month total. And we would like the seven years because she qualified for the seven years under the Code. The problem we're having is if he retires -- let's, for the sake of numbers' sake, if he retires and it's $2,000 for the retirement, she's asking for $1,000 a month in spousal maintenance. The problem is if he applies for disability, and he's indicated he's going to, he's not certain what they will have for disability. And so if it goes down to 1500 retirement, the other five goes to disability, she has -- she cannot be awarded anything out of that disability and therein lies the problem.

THE COURT: Okay. So where we are right now is alimony for -- she's alleging now, pursuant to the Code, seven years of alimony by virtue of her disability at $3,000 a month; is that correct?

MR. HINDERA: Total for both the retirement and the spousal maintenance to bring her up to $3,000 per month.

THE COURT: What would her share of the retirement be in the event that he retires?

MR. HINDERA: Well, she gets 50 percent, but that's the problem. We don't know whether that --

we think at this point it's $1,800.

THE COURT: Her share and his share?

MR. HINDERA: Her share.

THE COURT: So $3,600 total.

MR. HINDERA: Somewhere around $3,600, around there.

THE COURT: And they have agreed to split that 50/50?

MR. HINDERA: Oh, yeah.

THE COURT: So 50 percent of his retirement is agreed to, correct?

MR. RIPPY: And that's true. That is true, whatever it is. The problem is, Judge, we don't know what 50 percent of his retirement is going to be because he's going to get some level of disability. And what their side of the case would like -- let's say his level of disability drops his actual retirement from 1,800 to 1,500. They would like for seven years, apparently, us to pay an additional 1,500 to get her up to 3,000. And that is not our offer to them, but that's what they would like.

THE COURT: Okay.

MR. RIPPY: So whatever his retirement turns out to be with whatever his disability turns out to be, they would like a supplement to get her up to

3,000.

THE COURT: To narrow the issues down, Lawyers -- once gain, Mr. Hindera, I'm going to give you all of the time you need. I'm just trying to clarify in my mind because it's a bit convoluted.

MR. HINDERA: I can do that very succinctly, Your Honor. We're arguing over whether it's 2,500 a month she needs or 3,000. How that gets done is where the disability --

THE COURT: The numbers I just heard are 1,500 or to 1,800.

Have the parties -- is it your client's position that he's willing to pay some alimony to her?

MR. RIPPY: Yes, it is, Judge.

THE COURT: And so we're fighting over 500 a month?

MR. RIPPY: I don't know if his offer is 2,500 or 2,000.

MR. PECK: When we walked in here, it was 2,000.

THE COURT: Just talk to your lawyer. I don't need to hear what you say.

MR. RIPPY: Judge, I can tell you what our offer is because right in the middle of the Proposed Disposition of Issues, I think I lay out what we thought

were 10 issues. And now we can just check off the ones that are settled. But Mr. Hindera is right, the big one that is not settled is after she gets 50 percent of his retirement, which we concede she'll get, then how much in addition to that and for what period of time does he pay it. And I can't remember if our offer was 2,500 or 2,000, but it will be on here.

THE COURT: It sounds like for a period of seven years she wants all of the retirement, in essence.

MR. HINDERA: No.

MR. RIPPY: The total retirement would --

THE COURT: 3,000.

MR. RIPPY: The judge is pretty close.

THE COURT: So it's 3,000 in his retirement. She wants the Court to find that she's disabled. I've heard no evidence on that, but I will because I can see the big stack of documents. And what she's wanting is for seven years to receive $3,000 a month. Is that correct?

MR. HINDERA: Yes. Major Peck --

THE COURT: Which, in essence, is his retirement?

MR. HINDERA: Well, Major Peck has a master's degree. He's going to retire, but he's only in his early 40s. I think he's 44 maybe and he's going to

continue to work. I know this sounds draconian. The last offer on the table was 2,500. My client would like 3,000. And she's looked at her budget and I agree, Your Honor.

THE COURT: Does she have a job, Mr. Hindera?

MR. HINDERA: She cannot work, Your Honor. First of all, she physically cannot work. And then she has some memory issues because of some electroshock therapy that she had, in addition to some other things going on.

If you would like for us to talk about that, I would be glad to with Mr. Rippy out in the hallway.

MR. RIPPY: Well, we don't concede to that. But in the middle of our proposed disposition, as promised, we laid out ten issues. I think all but three -- actually, now we brought attorney fees and back taxes. All but five are settled. And our offer is bring her up to 2,000 a month, which would, the Court is right, be, more or less, two-thirds, not quite, of his retirement. That's right. And our offer is seven years, which is pretty generous, since that's the maximum, but dating back two years because we've waited two years. This is a 2012 case. We've waited to get a

divorce. For what reason? Why did we wait for two years? So she has free medical insurance which is a value of about 400 a month for life. She has 20/20/20 TRICARE now because we waited until after January 28th, I believe it was.

THE COURT: And I recall that issue coming up in an earlier hearing.

MR. RIPPY: That's a huge benefit to her, Judge. So for the last two years while we waited to get divorced and got her free medical insurance for life, we also paid her 2,000 a month. And so that's how we know 2,000 a month is the right amount because we've been paying it for 24 months. So we would like a little credit for that. So that's why we say five years, half of his retirement, plus approximately 500 a month to get her up to 2,000, not 3.

THE COURT: So that's really --

MR. RIPPY: That's the issue.

THE COURT: That to me sounds like to understand -- because I know you guys have, obviously, a lot of information. And in looking at your proposed disposition, which is unique, because normally I'm not asked to award meat thermometers to one party or the other. That's not something people normally ask state trial court judges to do. I'm trying to figure out --

so there's been a division of the personalty. They've divided the meat thermometers, correct?

MR. RIPPY: In the sense that neither parties live in the house right now, Judge. And if it's in the house, she can have it. So there, it's divided.

THE COURT: Okay.

MR. RIPPY: Unless it's our toothbrush or something or our military --

THE COURT: Why don't you talk to him, Mr. Rippy, and find out what his -- I don't need to hear what he has to say.

(Conferring.)

MR. RIPPY: Well, Wayne says I don't think she wants that. Personal items, I don't think she wants that.

THE COURT: Okay. So I'm to assume that she's in the house. There's property in the house and she's keeping it?

MR. HINDERA: Here's the way this came down, Your Honor, if I could, and it will make this clear.

THE COURT: Thank you.

MR. HINDERA: What her problem is, because it does seem a little strange, but here's how this came down. Mr. Peck, we've got these handwritten notes from

him saying, Give me everything or I'll divorce and you won't get anything.

THE COURT: If you'll allow me, Mr. Hindera, you like to talk a lot, but I'm just trying to get down to brass tacks.

MR. HINDERA: Okay. But you're assuming --

THE COURT: I want to find out what the situation is.

MR. HINDERA: You're assuming, Judge, that she is in the house and she's not.

THE COURT: I'm not assuming. I don't know.

MR. HINDERA: Okay. She was locked out of the house.

MR. RIPPY: Nobody is in the house.

MR. HINDERA: Major Peck took the house as part of the agreement, the temporary orders agreement, and then he moved a bunch of stuff out contrary to that agreement. She's living in a house a couple of blocks away.

THE COURT: Mr. Hindera, I'm just trying to figure out, at this point in time, has there been a division of the personalty. That's all I want to know. Where are the meat thermometers and who is going to keep them.

MR. RIPPY: We say if it's in your possession, it's yours. And if it's in the house with the exception of the weight set and his personal items, it's hers. The house is about to sell so it will be empty.

THE COURT: I'm just going to tell you, Lawyers, I'm going to drop you to mediation and make these parties pay one-half if you're going to ask me to divide meat thermometers and vases. Now, can I make myself any more clear about the Court's position on that ridiculous issue? Am I clear?

MR. HINDERA: Yes, Your Honor.

MR. RIPPY: Yes.

THE COURT: Mr. Hindera, I want to hear now that we've divided the personalty, that whatever she's got in her possession she keeps. It sounds to me we have an alimony issue, period, because I'm -- I'm not going into this. I'm going to send you to mediation or see if I can get you into a binding arbitration and let you spend your 10- to $15,000 on having a mediator divide that for you because I'm not going to do it.

MR. HINDERA: Well, Mr. Hubbard, who mediated the first time, is back there.

THE COURT: Welcome, Mr. Hubbard.

MR. HUBBARD: Thank you, Your Honor.

THE COURT: Have a seat.

MR. HUBBARD: Thank you, Your Honor.

THE COURT: Now, where are we? And, Mr. Hindera, my -- I certainly am not directing any of this at you. I'm trying to get your client to where she's aware of what the situation is here, and I don't believe that she has a firm grasp of where she is right now.

Now, Mr. Rippy, if you will clarify for me. It sounds to me where we are at the present time is an alimony issue. The house is 60/40 split from my understanding. His retirement is 50/50. So we're fighting over a 500 amount.

MR. RIPPY: And we agree to split the other accounts 60/40 as well in her favor, except for one, which is attached to our proposed disposition, which is his Morgan Stanley account, formerly the Smith Barney account, which has always been in both of their names, but which came from his father's inheritance, which is undisputed.

THE COURT: And he's agreeing to a five-year payout on alimony. She disagrees because he wants credit for the two that he's already paid. And she wants an additional two based on the date the divorce is granted.

Is that right, Mr. Hindera.

MR. HINDERA: He paid her spousal support during the pendency of this.

THE COURT: I know, Mr. Hindera.

MR. HINDERA: And I think that's a legitimate argument that Mr. Rippy is making. There's actually -- the only account that is undisputed that is separate property is this one that her parents have put all of the money into themselves --

THE COURT: Any problem with that?

MR. HINDERA: -- as a gift.

MR. RIPPY: That's in her name alone. We concede that's her separate property.

THE COURT: That's resolved.

MR. HINDERA: There are other accounts to which we've agreed to split those 60/40 except for the Smith Barney account that Major Peck contends is his separate property.

MR. RIPPY: That's all right.

THE COURT: Okay. So the Smith Barney account, what -- and what's in that account, Mr. Rippy?

MR. RIPPY: Approximately $40,000. He inherited approximately $67,000. So he could be making a separate property reimbursement claim of $27,000, but he's not. But he's certainly -- even though both names

we concede are on that account, but they always have been. And the only money that's ever gone in there was from his inheritance, and they dipped into it during the community and they spent over 20,000 of his inherited dollars. And he could be asking for that. He's not, but what he is asking for is that that account be confirmed as his separate property inheritance account. I don't think anybody is going to contradict the fact that 15 years ago his dad died and he inherited $67,000.

THE COURT: Just a minute. Let me catch up to you.

Personalty is divided. Are there any, Mr. Hindera, items of personalty that aren't in her possession that she wants that he has control over?

MR. HINDERA: Not that I'm aware of, Your Honor, but I'm sure Mr. Rippy and I will be able to work that out.

THE COURT: I appreciate that. So what I'm going to basically at this point in time take as a stipulated agreement is that what they have in their possession, unless specified at the conclusion of today's hearing, they keep.

MR. HINDERA: Yes, Your Honor. It's all on this list that I've handed you. They have agreed at this point, whatever is on this list, she can have.

THE COURT: Is that your agreement, Mr. Rippy?

MR. RIPPY: I think that's right. You know, this is a brand-new list today, but it looks pretty much like the old list. In fact, it's a little shorter than the old list. So if she's got in her possession or it's in the house --

THE COURT: What I'm trying to do, Mr. Hindera, is get some stipulations before we begin your hearing.

MR. RIPPY: I think it's hers.

THE COURT: And so let's let him look at it. If they will stipulate to it, then I can move on from personalty. Take your time.

MAJOR PECK: Keep going and I will look while you're going.

THE COURT: All right. So I'm trying to find out whether we can stipulate to personalty. And it looks like we're very close.

MR. RIPPY: I think the answer is "yes."

THE COURT: So alimony, 2,500 on his behalf, five years; 3,000 for 7 years on her behalf. That's where we're down on that.

Now, the separate account, the Smith Barney -- what's in the Smith -- I know,

Mr. Hindera, but I'm the one trying to make the decision. Don't get frustrated with me and I won't get frustrated with you. The -- I'm trying to find out now on the Smith Barney account, what's in that Smith Barney account for her?

MR. HINDERA: There's two Smith Barney accounts.

THE COURT: All right.

MR. HINDERA: There was one that has always been Smith Barney that her parents started.

THE COURT: That's the one I'm talking about.

MR. HINDERA: Would you like the account number?

THE COURT: No. I just want to know what's in it. And who has your account? What's the designation on your separate property that you're alleging is your separate property?

MR. RIPPY: And, Judge, it's attached in our proposed disposition. It's in both of their names and it always has been since the death of his dad back when it was Smith Barney. Now it's Morgan Stanley.

THE COURT: Morgan Stanley. And that's about $40,000?

MR. RIPPY: I believe it is, Judge. I

think it's 41.

THE COURT: All right. And what's in the Smith Barney account that she's claiming to be her separate property?

MR. HINDERA: Somewhere around $40,000, Your Honor.

THE COURT: Does she dispute that under the inception of title that that was from -- in that account from his inheritance?

MR. HINDERA: Yes, Your Honor.

THE COURT: She won't stipulate to it?

MR. HINDERA: His father died in '91. The earliest that we've heard, the money went in in '95. Obviously, we get the probate procedure, but it started out at 100,000, and then it was 69, and now it's 63 or whatever it is. We're not sure what went in there, and she's not trying to be obstreperous. She just doesn't agree, that she thinks there were community funds that went into that account.

THE COURT: Okay. All of the other accounts, he's agreeing to divide 60/40. House proceeds, he's agreeing to divide 60/40.

Does your client stipulate to that division?

MR. HINDERA: Yes, she does, Your Honor.

THE COURT: And I do recall -- there should be a record -- I want to make sure, Mr. Hindera, have you been on this case from the beginning?

MR. HINDERA: Yes, Your Honor.

THE COURT: Okay. I recall a hearing where we postponed so that she could qualify under Survivor to have the insurance for the rest of her life. This rattles something in my memory.

MR. HINDERA: That's right, Your Honor.

THE COURT: Okay. So he did that in an effort to accommodate her on medical care; is that right? Is that an accommodation?

MR. RIPPY: It is, Judge. From our point of view, it's a huge one.

THE COURT: And during that period of time, he also paid alimony and delayed getting the final divorce so she could qualify for health insurance?

MR. RIPPY: And it will be uncontroverted and paid the mortgage on the house that entire time that she's about to get 60 percent of.

MR. HINDERA: He took the house and there was a mediated settlement agreement that agreed to those terms. The hearings we had were to set that aside.

THE COURT: Okay. So I think where we are at this point in time, narrowing it down: Alimony,

Smith Barney, Morgan Stanley. Everything else is done?

MR. RIPPY: Well, there is -- I heard a new mention of 2011 and 2012 tax refund and attorney fees. Now, it's the first --

THE COURT: Let me address the tax refunds. Have you already got them?

MR. RIPPY: Oh, yes, and we've spent them.

THE COURT: And you spent them. Well, he was paying the mortgage, he was paying alimony. The way the Court views that is it's gone. It's okay.

So where do we go -- now, on the refunds, that's a nonissue, because they're spent and he was providing support and making mortgage payments, and I think really doing everything the Court told him to do. So I'm not going to make him come back and regorge it. So on the refunds, let's take that off the table.

What other tax issues might you have, Mr. Hindera?

MR. HINDERA: Well, they have the 2013 taxes. And Mr. Rippy and I can deal with that.

THE COURT: Partition?

MR. HINDERA: We'll partition it 60/40.

MR. RIPPY: Okay. We'll stipulate to that, Judge. We'll file jointly and partition any refund 60/40 in her favor.

THE COURT: All right.

MR. RIPPY: Very good.

THE COURT: That resolves that issue.

MR. RIPPY: And we heard something about attorneys' fees. And the Court correctly pointed out. I wasn't the attorney. I was hired to try the case. So way back when, apparently there were a couple of hearings on temporary orders. The results of which were, as the Court also correctly pointed out, that my client paid 2,000 a month, plus another 2,000 for a mortgage on a house where she's now getting 60 percent of the equity. So my point is if the Court didn't award attorneys' fees at that time, let's not retry the temporary orders.

MR. HINDERA: I understand -- before we put him for the Albert Schwitzer Award, please understand we did go to the Army under 608-99 and make him pay for his spouse. We tried to play this as easily as we could and as light-handed as we could, Your Honor.

THE COURT: I certainly, Counsel, don't view him as Albert Schweitzer by a long shot. Let me -- I'm just at this point in time going to focus everyone -- because you're, obviously, inundated with information. So what I want to do is get it short, simple, and concise and make a decision and get them

divorced, which they -- a divorce which they both obviously sorely need. And I'm going to hold your feet to the fire.

It appears to me, Counsel, that they are stipulating to alimony beyond the three years, up to five years. It's now a question do I go five or do I go seven, correct?

MR. HINDERA: And, Your Honor, we're fine with five because of the period we're asking. And, actually, I would be shocked if there isn't a finding of disability, but whether it's five or whether it's three or whether it's seven, she's going to have to come back and prove that from time to time. So I'm fine with the five years.

THE COURT: I think what you might want to do, you may want to put your information on whether or not she's truly disabled.

What's your position on this, Mr. Rippy?

MR. RIPPY: Well, Judge, I'm glad you asked, because my opinion is it doesn't matter. You know, we've stipulated she's either going to get five or seven years, that's more than three, which is certainly what the law in Texas was for a long time. So who cares if she's disabled. We're going beyond -- you know, we're not stipulating, and even Mr. Hindera has not

asked for some kind of lifetime disability. So who cares if she's disabled. We don't need to find whether she's disabled or not. We've stipulated five years or seven.

THE COURT: I believe that the code has extended to three now.

MR. RIPPY: It has right around the time this was filed, but we concede because 20- to 30-year marriages without disability now are eligible for up to seven years. So we concede we'll pay seven years, we just want credit for the last two years. And so it doesn't matter if she's disabled. The Court doesn't need to hear any of the evidence on her disability. It's either five or seven years.

MR. HINDERA: Then we can't stipulate to that.

THE COURT: No, you can't.

MR. HINDERA: She qualifies under 8.054.

THE COURT: Hold on just a minute, Counsel. Let me catch up to you here. I want to review it again. 8.054?

MR. HINDERA: Yes. It's on Page 98, Your Honor.

THE COURT: What's the duration of this marriage again? 24 years?

MR. RIPPY: I think 25 now, Judge. Yes, sir.

MR. HINDERA: And, Judge, Ms. Peck did all of the things that an officer's wife is supposed to do. There's a certain amount of labor and input that goes into it to play the role that Major Peck needed her to play. She ought to receive the benefits for continuation of the marriage.

THE COURT: All right. Mr. Hindera, I interrupted you and you were very gracious about that, and I want to graciously not interrupt you again and let you give me your full opening statement.

Thank you for accommodating the Court. You may proceed.

MR. HINDERA: I apologize, Your Honor. I don't know that I need much of an opening statement. This is a 25-year marriage. They've had one child, who is now 22. They are where they are, and we have mediated this twice. This began when Mr. Peck -- when Major Peck wanted out of the marriage. And we have -- as Mr. Rippy has noted to the Court, we prolonged that for two years so that now Ms. Peck qualifies for the medical care that she needs and is going to use and does use. This began because Mr. Peck said, "Give me everything or I'll divorce you. You won't get your

healthcare." And then that turned into a move-out for two weeks and give me a vacation. And at that point, when she complied with that vacation to give him some breathing space, he changed the locks on the doors and she did not even get back in the house to get her underwear for another two months.

We reached a settlement agreement. We then came back for two more hearings. We've kind of brought this case forward as we go along. The fact is she did what she was supposed to do in the marriage, and she ought to enjoy the benefits of the 25 years that she invested here.

Now, it's not clear -- it's almost impossible to try to fathom what the issue is with spousal support. But, essentially, what we're asking for is either $700, which would bring her up to $2,500 per month, because she's still going to have -- even with the TRICARE, she's still going to have considerable health expenses.

I think the Court will see that she just simply cannot work. There's just no way. We've had trouble having her assist us to prepare this case.

So what we're asking for is the spousal maintenance in an amount the Court feels fair. We want a finding that she qualifies for that under

8.054(a)(2)(A) in the Code and then 8.054(b). And we would like the Court to set some periodic hearings to see if she's still disabled, but she's 49 years old and she's not going to get any better.

It has not been -- we have not been back in here nickeling-and-diming this thing. I've tried to just kind of move it along and push it along to a final fruition.

I don't want to get into the numerous times that Major Peck broke his agreement, because this was his agreement. This wasn't the Court's. This was the agreement he sat down and made himself. And the minor transaction -- the things of moving this around and moving the miles and violating that restraining order that was attached to the mediated settlement agreement, but it's continued throughout and Ms. Peck has tolerated it.

Now, the latest episode is just what happened here within the last week where he's now engaged, he's now on Facebook, and she's got to deal with all of that. What we want you to do is order the spousal maintenance, make the finding of disability. I don't know how they're going to prove the community -- the separate property on their -- on their -- his claim for this IRA account, this Smith Barney or Morgan

Stanley or whatever it is at this point, but we've -- certainly that's their burden and we're ready to put on our case.

THE COURT: All right. Mr. Rippy.

MR. RIPPY: Yes, sir, Judge. And really, we don't need much time, either, just two quick remarks. First, you see what a moving target they are. I mean, I didn't say seven years. I didn't say five years. That came during the first portion of Mr. Hindera's opening remarks. The Court even repeated it, are we talking about five versus seven years and 500 a month?

Now all of a sudden we want a finding of disability and periodic review. No, no, no. We don't want to come back to court again. It's a virtually impossibility to pin down the moving target that is Ms. Peck. So, no, we want a specific amount of time.

And our suggestion on our Proposed Disposition of Issues, and I'm going to go through it rapidly with Mr. Peck when I get him on the stand, is whatever his retirement is, and we've stipulated that she gets half of, we're going to pay some amount over and above that to get her up to either 2,000 or 2,500 or for some set period of time so we don't have to come back here all of the time for a periodic review of her health. And at first, they said seven years, and then

they said five years -- or we countered with five years. And now in the second part of the opening statement, we want a finding of disability and periodic review. We don't want that.

Second thing, I don't think we have to waste a lot of time to put on evidence of her disability or lack thereof. She has a master's degree, too. You might have heard Mr. Hindera mention the master's degree that my client has. There's business records affidavits on file with the Court. I've seen them. There's probably 20 pages attached to them. We will stipulate they're in there and the Court can take judicial notice of them. And if the Court thinks that those records -- the attached business records affidavit established that she can't work or has tried to work or can't meet her minimal reasonable needs, all of which she needs to establish, that's fine. We will stipulate the business records affidavits that are in the Court's file or the Court can take judicial notice of them, whatever all that is, yeah, we're going to object to.

So our only two points before we start calling witnesses are, No. 1, you can see what we're dealing with, such a moving target, five years, seven years. Now we're hearing periodic review. We just can't pin them down and therefore we can't come

back to court for a periodic review. We want a set amount of time.

And, No. 2, if they're saying, Well, we have evidence she's disabled, we need periodic review of her health because we don't know what her health is going to be, okay, there's business records affidavits in Court's file. The ones that have been on file more than 14 days, we don't object to. Have a look at them. We don't think they come close -- well, actually, we know because there's not that many pages of them. They don't say she can't work or she's disabled or can't meet her minimum reasonable needs, nothing like that.

So with that, let's start calling witnesses, because as far as I can tell, the only real issues are how long do we pay some amount of money over and above the half of the retirement that she gets.

Thanks, Judge.

THE COURT: Counsel, I do need to see, since he's stipulated to those medical records, I would like the 20 pages that have a business records affidavit that's been on file for the requisite period of time so that the Court may review them.

MR. HINDERA: Well, there's more than 20 pages.

MR. RIPPY: And they're in the Court's

file.

MR. HINDERA: We put the business records in there. We didn't put these into the Clerk's file.

THE COURT: Mr. Hindera, you don't have to argue with me. I'm just making a statement. I want to see the records that have been properly authenticated that he laid the objection to. That's all. Thank you.

MR. HINDERA: Well, I've marked there where the Mayo Clinic says she's disabled. It's in that highlighted portion, Your Honor.

MR. RIPPY: And the only question I have is are we looking for something filed attached to a business records affidavit more than 14 days ago?

MR. HINDERA: I was assured by my staff that these were filed last summer.

THE COURT: Well, before I start looking at things, I need to make sure that they are properly authenticated, because we will have to break at about 3:45, and I will make you come back tomorrow if we're not finished by then.

MR. HINDERA: Okay.

MR. RIPPY: Well, I think there's a fairly easy solution, right? I mean, if they've been on file more than 14 days, they're in the Judge's file. I mean, you don't have to rout around for them, Mr. Hindera.

The judge has them. And there are, I'll stipulate, a bunch of records and they're old. They're -- a year ago they were filed. Okay. The Court can take judicial notice of those. There are --

MR. HINDERA: And Ms. Peck can testify to her condition. She's an expert.

THE COURT: She can certainly testify as to her condition.

MR. RIPPY: And we agree to that, too, Judge.

MR. HINDERA: You know, I will tell you, I hate these cases on both sides, and I work on both sides.

THE COURT: Mr. Hindera, you know where you are, and you know that's not proper. Give me a minute.

All right. Let's proceed. I've got affidavits. I don't have any records in the file.

MR. HINDERA: Then I've got them right here.

THE COURT: So that's what that covers?

MR. HINDERA: Yes.

THE COURT: Okay.

MR. HINDERA: Well, the affidavits are right here.

THE COURT: I've seen the affidavit.

MR. RIPPY: Okay. So if it's not in the Court's file, then we object to it being introduced. There are some records that I recall attached to those affidavits. Maybe there are none. But they're old. They're a year ago, but they don't say she's disabled, unable to work, can't meet her minimum reasonable needs, nothing like that. So the Court can take judicial notice of its file. That's the idea of Rule 902.

THE COURT: Call your first witness, Mr. Rippy. Thank you. Let's proceed.

MR. HINDERA: Well, I'm the Petitioner.

THE COURT: Well, thank you. Then call your first witness.

MR. HINDERA: Thank you, Your Honor. I will call Nancy Peck, Your Honor.

THE COURT: Mr. Hindera, let's approach the bench, both lawyers.

(Beginning of bench conference)

THE COURT: Be careful with me.

MR. HINDERA: I'm not trying to disrespect the Court.

THE COURT: You just did. Now, I'm just going to warn you because I'm treating you with respect, I expect that to be reciprocated.

MR. HINDERA: And I truly apologize for any

reason. I thought I was --

THE COURT: Apology accepted.

MR. HINDERA: -- being respectful. I do respect this Court. I was simply saying I understand the stakes here, nobody likes these cases. I agree with that.

THE COURT: All right, as long as we understand each other.

(End of bench conference)

THE COURT: All right. Mr. Hindera, you may proceed.

NANCY MARIE PECK,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HINDERA:

Q. Ma'am, would you state your name for the record, please.

A. Nancy Peck.

Q. And you are the Petitioner here?

A. Yes.

Q. And you are currently married to Major Wayne Peck?

A. Yes.

Q. And when were you married?

A. June 24th.

Q. When did you cease --

A. 1989.

Q. And when did you cease to live together as husband and wife?

Did you cease to live together as husband and wife on or about December 18th, 2011?

A. Yes.

Q. And are you currently pregnant?

A. No.

Q. Are there any children that are under the age of 18 born of the marriage?

A. No.

Q. Has the marriage become insupportable because of discord or -- conflict of personality or discord that renders the ends of the marriage relationship meaningless?

A. Yes.

Q. Is there any reasonable expectation of reconciliation?

A. No.

Q. And are you asking the Court to make a determination of the issues that we put in front of the Court here, these limited issues?

A. Yes.

Q. Okay. And are you asking for a name change?

A. No.

Q. Okay. Now, you sat and listened to my representation to the Court as to how this divorce began, correct?

A. Uh-huh, yes.

Q. Were there any inaccuracies in what I told the Court in how this divorce began?

A. No.

Q. Okay. Now, are you able to work?

A. No, I'm not.

Q. Okay. Would you please --

MR. HINDERA: Your Honor, may we approach briefly?

THE COURT: Certainly.

THE REPORTER: Do y'all want this on the record?

THE COURT: Yes.

(Beginning of bench conference)

MR. HINDERA: Your Honor, I wasn't clear as to what I riled up the Court. I truly am --

THE COURT: We're fine. Let's move on.

MR. HINDERA: Can I start to put in my records?

THE COURT: Absolutely.

(End of bench conference)

Q. (By Mr. Hindera) Now, ma'am, the biggest issue that you have health-wise, is it the Ehlers-Danlos syndrome that you have?

A. Yes. It's the symptoms related to that.

Q. And when did you first notice those symptoms?

A. They've been going on for a very long time. I mean, it's a genetic, progressive condition. And it wasn't diagnosed until not last summer, but September, October before that.

Q. Okay. Did you visit the Mayo Clinic?

A. Yeah, I was sent to the Mayo Clinic.

Q. When was that?

A. In September, October of not this last year, the year before.

Q. Okay. And was there a diagnosis made there?

MR. RIPPY: Well, Judge, now I'm going to object as to hearsay. I think she's about to testify as to what some doctor told her. Obviously, her statements in seeking medical attention would not be hearsay. But the doctor's diagnosis back to her would be. And I don't think the Mayo Clinic records, I think they're recent enough, they're not in the Court's file.

THE COURT: Mr. Hindera, your position on that objection?

MR. RIPPY: Objection; hearsay.

MR. HINDERA: Your Honor, I think this witness qualifies under 702 even if she is an expert, has a master's in nursing, she certainly can tell the Court what her opinion is and what data she used to reach that opinion.

THE COURT: Objection to hearsay is sustained.

Q. (By Mr. Hindera) Ma'am, did you -- what other health issues do you have?

A. My symptoms?

Q. Please tell this Court why you are disabled and unable to work.

A. I have trouble --

THE COURT: You need to speak into the mike.

A. I have trouble tracking my thoughts, so I prepared this statement to read. Is that okay, Your Honor? But it explains why I'm unable to work in a concise manner.

Q. (By Mr. Hindera) Okay.

THE COURT: Hold on just a moment.

There's a document that she's reading from.

THE WITNESS: That I wrote.

THE COURT: Hold on just a moment.

MR. RIPPY: Which I haven't seen. And so

the objection would be narrative answer maybe, but I suppose we'll let her start without objecting.

THE WITNESS: I mean, I can try to do it on my own --

THE COURT: Ma'am, at this point in --

THE WITNESS: -- but I might not get it all --

THE COURT: Ma'am, at this point in time, I just want you responding to questions but not offering information that is not responsive to a question.

THE WITNESS: I'm sorry, Your Honor.

THE COURT: Mr. Hindera, if you would like to do this in question and answer, I believe that would be the more appropriate mechanism.

MR. HINDERA: Thank you, Your Honor.

Q. (By Mr. Hindera) Ma'am, do you have some hypermobility problems?

A. Yes. I have a deficit -- a genetic deficit in my connective -- collagen in my connective tissue.

Q. And when did you first become aware of that condition?

A. They were -- it took them a few years to diagnose it.

Q. When did you first attempt to have it diagnosed?

A. A couple of years before the Mayo Clinic visit.

Q. So approximately 2010?

A. Yeah, you have the records on that.

Q. Okay. As we sit here today, is it your understanding that you have been diagnosed with hypermobility, Ehlers-Danlos syndrome?

A. Yes. There's several different types of Ehlers-Danlos, and mine is the hypermobility type.

Q. Okay. And with that, does that entail chronic pain?

A. Yes.

Q. How often are you in pain?

A. I'm constantly in pain. My goal is to maintain my pain at a level that is not extremely distracting to me.

Q. Okay. Now, do you have chronic fatigue?

A. Yes.

Q. As a symptom of the Ehlers-Danlos?

A. Yes. That goes with it.

Q. Do you have anxiety as a result of the Ehlers-Danlos?

A. Yes. And when I -- Mayo Clinic records will also -- and I'll say I have anxiety and depression due to my health issues.

Q. Okay. And do you have -- were you subjected to

electro shock therapy at some point?

A. Yes. After my son attempted suicide and my husband was gone in Afghanistan and came back, I went through a period of time that I was very depressed because of my progressing health issues. And at that time, they weren't fully understood. And I was hospitalized not for suicide but for just kind of giving up.

Q. Okay.

A. And they recommended shock treatment for depression that was not able to be treated with medication. And they also said that that also would help possibly with my pain issues.

Q. Okay.

MR. HINDERA: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (By Mr. Hindera) I'm now handing you what's been marked as Petitioner's Exhibit No. 23, and ask you if you recognize those documents.

A. Yes.

Q. Are those your records from Scott & White?

A. Yeah. I'm just looking to go see which doctor, because I've been to a lot at Scott & White. Yes, these are the records that were sent to the Mayo Clinic, I'm assuming, I think. Those are the records that were

compiled.

Q. Okay. Are those the records from Scott & White?

A. Yes.

MR. HINDERA: Okay. Your Honor, we would ask that Petitioner's 23 be admitted into evidence.

MR. RIPPY: And, Judge.

A. These are my psychological records, okay, my psychiatrist.

MR. RIPPY: And I think if these are the records I think they are, which are sent to the Mayo Clinic, I think that visit is too recent to be in the business records affidavit that's in the Court's file. So the objection is hearsay because of improper authentication.

MR. HINDERA: Your Honor, that affidavit is attached right here, and it's February 28th of 2012, shortly after this began.

MR. RIPPY: Okay. No objection if that is the affidavit and attached records that are in the Court's file, but it looks a little too thick to me.

Okay. No question that is an affidavit.

The second half of the rule is filed with the Court 14 days in advance to trial. I can't look at it and tell if that's what is in the Court's file.

MR. HINDERA: That has 94 pages attached to it, Your Honor.

THE COURT: Have you -- were all the prerequisites for filing a business records affidavit 14 days prior to trial, Mr. Hindera?

MR. HINDERA: Yes.

THE COURT: All right. It's admitted.

And what's the number on that, Mr. Hindera?

MR. HINDERA: It's No. 23, Your Honor.

THE COURT: All right. 23 is admitted.

(Petitioner's Exhibit No. 23 admitted)

Q. (By Mr. Hindera) And what was the diagnosis -- what was it that you went into Scott & White to be helped with?

A. This is my psychiatrist. So it was for anxiety, depression, and cognitive disorder.

Q. And was that before or after you were subjected to the shock therapy?

A. This was in -- this was after. It was after.

Q. Okay. And do you have memory issues because of the shock therapy?

A. Well, I had some memory issues prior to, and it was explained to me that they would do one side of the brain instead of both sides because of my memory issues that I have.

VIRGINIA BUNTING, CSR
(512) 940-6597

MR. RIPPY: I've got to object, Judge. Hearsay answers. She's, again, saying what was explained to her and told to her.

THE COURT: In regards to the objection to hearsay, it is sustained.

Q. (By Mr. Hindera) Now, ma'am, if you are to work as a registered nurse, do you have to have good short-term memory?

A. Yes. My memory, as you can see, I have to go by lists and notes, and I went through cognitive rehab therapy with my psychiatrist -- with my psychologist. And it was not successful. I rely -- I tried to use a smartphone to keep track of appointments, lists, and things like that, but as to working as a nurse, there is so much medical information that I would have -- really, not just nursing, but other types of jobs, that I have to keep lots of notes of lists and things to remember things. And I even have trouble keeping track of all of the notes. So to learn -- even to learn something new is very difficult for me.

Q. Now, what prescriptions are you currently on at this point?

A. I take -- should I say what they are and what they're for?

Q. Yes, please.

A. Okay. I take Bystolic, 5 milligrams. That's for high blood pressure and tachycardia, which is rapid heart rate. I -- and I also tend to go low blood pressure, too. My blood pressure is very unstable due to collagen deficit. But I'm also on Astepro, a nasal spray for allergies. Tessalon capsules for -- it's for allergies and when I have bad cough due to them. Zovirax. These are just the simple ones, not the major ones. Zovirax for cold sores. Proventil for asthma. And another, Veramyst for allergies, a nasal spray. And then I'm on a Clonazepam for anxiety.

Q. And, ma'am, I'm going to put this in. I'm handing you now what's been marked as Exhibit No. 21 -- Petitioner's 21. Do you recognize those records?

A. Yes.

Q. What are those?

A. It's my neuropsychological test.

MR. HINDERA: Your Honor, we would ask that Petitioner's 21 be admitted.

MR. RIPPY: Again, Judge, that's an affidavit that -- we'll stipulate it's a valid affidavit. It's just not file marked. So I can't tell by looking, is that the one that's in the Court's file and are those records attached? If it's represented to me it is, then we have no objection.

MR. HINDERA: It is, Your Honor.

THE COURT: Based on your representation, your 21, Mr. Hindera --

MR. HINDERA: Yes, Your Honor.

THE COURT: -- is admitted.

(Petitioner's Exhibit No. 21 admitted)

Q. (By Mr. Hindera) And, ma'am --

THE COURT: Mr. Hindera, you broke into her answer, though. She's at Clonazepam and did not finish her answer. I would like for her to finish all of the medicines that she's on.

A. Okay, Your Honor. Lexapro, 5 milligrams. And I take that every other day because if I take it every day, then I have some side effects from that. And that's for depression. Now, I take Adderall, 10 milligrams one or two a day. And I don't have ADHD. I take the Adderall to help me focus -- focus my thoughts. I was never on or diagnosed with Attention Deficit Disorder. I take Edluar, which is a sublingual melting Zolpidem tablet, and Lunesta, 3 milligrams tablet, both at bedtime for sleep. I have a sleep disorder. I take for -- and also those are -- because of my pain, I have trouble sleeping. I take Hydrocodone, Acetaminophen, which is also called Norco, 10.5 milligrams.

Do you want me to tell you dosages and stuff, Your Honor, or just the pills.

THE COURT: Just the pills.

A. Okay. I take one of those every six hours, a max, four a day. And I try to limit those to as few as possible. Tizanidine HCL, is also Zanaflex, I take that -- it's a muscle relaxant -- at bedtime for restless leg syndrome and for pain and muscle spasms. I take Exalgo, which is my main pain pill, XR, which is also called hydromorphine or morephone. I'm allergic to morphine, so I can't take that. And then I take 8 milligrams. I always said I wasn't going to say that. Excuse me.

I have an Epinephrine pen for allergic reactions that I have just in case. I take I-p-r-a-t-r-o-p-i-u-m Bromide nasal spray. I'm on Singulair. I take Librax because I have a lot of gastroenterology GI issues. So I take Librax for diarrhea PRN. And I take Dexilant PRN, and Levbid PRN, and Linzess, and they're all for either constipation, diarrhea, pain in my abdomen. And that kind of goes with Ehlers-Danlos stuff. And I take Col -- I can't ever pronounce this one -- C-o-l-c-r-y, and that was prescribed by my rheumatologist for unexplained low grade fevers that I've been having for many years. They

still haven't figured out why I'm having that. I do have a lot of abnormal labs. And that was one of the reasons that I was sent to the Mayo Clinic.

And do you want to know the over-the-counter?

THE COURT: No. Thank you.

I think she's completed her answer. Mr. Hindera, now, I believe you had some questions on your 21 you were examining her on before the Court.

MR. HINDERA: Yes. On 21, has that been admitted, Your Honor?

THE COURT: Yes, 21 was admitted.

Q. (By Mr. Hindera) Okay. Now, was there, in fact -- do you have some memory issues with respect to -- that were diagnosed there at Scott & White?

A. This is -- I don't know if this is Scott & White. It's Neuropsyche Services. I'm not sure if it's Scott & White or not, but it's Dr. William Dailey, Ph.D.

Q. Okay. Did Dr. Dailey diagnose you with some memory issues?

A. Yes, but --

Q. And is that what is reflected in the chart there that you have a composite memory issue, below score?

A.  Yes, but I actually was tested by my psychologist, and those are in your records, too, that were submitted earlier in Claudia Ghio's records.

Q.  Yes.

A.  And she did a more -- a different type of test, but it showed that my -- I have a composite memory deficit.

MR. RIPPY:  Judge, I'm going to object, because I think now we're testifying about some record that's not front of her.

THE WITNESS:  (Inaudible.)

THE COURT:  Hold on just a moment.

MR. RIPPY:  So nonresponsive, Judge.

THE COURT:  You need not to talk until I rule on the objection.

Mr. Hindera, do you have any response to objections?

MR. HINDERA:  No, Your Honor.

THE COURT:  Objection is sustained.

Q.  (By Mr. Hindera)  Okay.  Were you diagnosed with a composite memory deficit problem?

A.  Yeah.

Q.  And is that --

A.  I'm looking at how they described it.  Yes. "This is an abnormal set of neuropsychological test

results because of very impaired performance across most of the memory testing."

Q. Now, given that you are a registered nurse, you can't give out medicines to be responsible for that, can you?

A. No. I would be -- I mean, I did not renew my license because I haven't worked as a registered nurse in quite a while, and I don't feel that confidently I could be able to do that job because there is a lot of memory, especially verbal memory involved with that.

Q. Okay. And did you see a Dr. Awilda Luciano at the Medical Clinic of North Texas?

A. I would have to look at the name. Is she a rheumatologist? Is that in --

THE COURT: Hold on, ma'am.

MR. HINDERA: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (By Mr. Hindera) I'm handing you now what has been marked as Petitioner's 18 [sic]. Do you recognize those documents?

A. She's the original rheumatologist that I've seen.

Q. So you recognize those documents? Yes?

A. Yes.

MR. HINDERA: Your Honor, we would ask that

Petitioner's 18 [sic] be admitted into evidence.

MR. RIPPY: And again, Judge, it looks like it has an attached affidavit and it's not file marked, but if it's represented to me that it's one of the ones on file with the Court more than 14 days ago, we have no objection.

THE COURT: Is that the case, Mr. Hindera?

MR. HINDERA: It is, Your Honor.

THE COURT: Your No. 18 [sic] is admitted.

(Petitioner's Exhibit No. 20 admitted)

Q. (By Mr. Hindera) And, ma'am, when you saw Dr. Luciano, was there a diagnosis of hypermobility problems that are reflective of the Ehlers-Danlos syndrome?

A. Yes. She actually said that I had Ehlers-Danlos syndrome. But when she did the records, she diagnosed with the hypermobility syndrome, which sometimes they both kind of go hand in hand. But she wouldn't document the Ehlers-Danlos syndrome. The geneticist at Mayo Clinic made that final diagnosis, but her diagnosis was the hypermobility syndrome and fatigue.

Q. Now, did you see a Dr. Robert Burlingame at some point?

A. He's the psychiatrist, right?

Q. Yes, ma'am.

A. Yes. Uh-huh. That was in Washington.

Q. At the time that you saw Dr. Burlingame in 2002, were you exhibiting symptoms of the Ehlers-Danlos with respect to your memory?

A. Yes. I'm pretty sure I was at that time, because I had already tried changing positions -- job positions.

MR. HINDERA: May I approach, Your Honor?

THE COURT: Yes, sir.

Q. (By Mr. Hindera) Ma'am, I'm now handing you what has been marked as Respondent's Exhibit 20 [sic]. Do you recognize those?

A. Yes.

Q. What are those?

A. These are progress notes. And this is a form that I fill out prior to seeing the doctor and then he makes notes on them.

Q. Okay. And with respect to that, did Dr. Burlingame make note of any memory issues that you have?

A. Yes.

MR. HINDERA: I would ask that Respondent's [sic] 20 be -- 20 [sic], right --

MR. RIPPY: 20 [sic] it is, yes.

MR. HINDERA: -- be admitted into evidence.

MR. RIPPY: And again, same objection, which is no objection if it's actually -- if there's a file marked copy of that somewhere. It's not what the witness is holding, but if it was filed more than 14 days ago, then we have no objection.

THE COURT: Is that the case, Counsel?

MR. HINDERA: That is, Your Honor.

THE COURT: Objection is overruled. And 20 [sic] is admitted.

(Petitioner's Exhibit No. 22 admitted)

A. Am I answering a question?

Q. (By Mr. Hindera) Has anyone ever ruled out Ehlers-Danlos syndrome to your knowledge?

A. I've been diagnosed with it, yes. They've ruled out other things and made a definitive diagnosis of Ehlers-Danlos syndrome.

Q. And what does -- would you please tell the Court what the Ehlers-Danlos syndrome does.

A. Well, there's several different types. And the hypermobility type, it's a progressive genetic syndrome in which I have a deficit in the collagen in my connective tissue. So the only easy way to explain it is the stuff that wraps around your body causes the structure of a connective tissue that surrounds the

muscles, blood vessels, nerve binding, nerve binding some structures together and allowing others to slide smoothly over each other. So your connective tissue is everywhere. It's in your -- it's everywhere in your body. And my connective tissue -- part of your connective tissue has collagen in it, and my collagen is defective. And the collagen is what gives your connective tissue elasticity and strength.

MR. RIPPY: Okay. Judge, I'm going to object to a narrative answer and relevance. If there's no place in these records -- I just want to see something that says that she's permanently disabled and can't work. And I'll take her on voir dire for a limited purpose and ask her that if that will shorten this.

A. Yes. That's --

THE COURT: Ma'am, do not respond unless it's a response to a direct question. Your objection on relevance is, for the moment, sustained. I do believe we need to focus on the disability, if you would, counsel. Sustained.

MR. HINDERA: Okay.

Q. (By Mr. Hindera) Ma'am, I'm now handing you what has been marked as Petitioner's Exhibit 6 [sic]. Do you recognize those as the records of Austin Pain

Associates?

A. Yes.

MR. HINDERA: Your Honor, I would ask that No. 6 [sic] be admitted into evidence?

THE COURT: All right.

MR. RIPPY: Okay. Judge, and here's my same objection. There's an affidavit attached to that. That's not in the Court's file. That's way too big. So now that's making me wonder about these previously admitted exhibits.

MR. HINDERA: We didn't put the records themselves, Your Honor, because we generally don't do that.

THE COURT: Have these records been produced?

MR. HINDERA: Yes. They have them all. They've been produced in electronic form and were available. They've all been scanned. These have probably -- they're Bates stamped. They've all been produced.

MR. RIPPY: But not filed. You can't just file the affidavits. And now I'm thinking that every one of these admitted affidavits, at least the attached records weren't filed. And that's only half the rule. That's not compliance with authentication and makes them

hearsay. So -- but in the interest of time, if I can take her on voir dire for a limited purpose --

THE COURT: I will allow you to do so.

MR. RIPPY: -- I will stipulate the admissibility of that giant stack of records that aren't in the Court's file.

THE COURT: You go right ahead, Counsel. I will allow you to take her on Voir Dire.

VOIR DIRE EXAMINATION

BY MR. RIPPY:

Q. Okay. Ma'am, to you knowledge, in any of these records, including the ones that aren't admitted yet that I'm going to withdraw my objection to, is there any place in there where it says you can't work, to your knowledge?

A. Well, I didn't apply for disability.

Q. That's a yes or no question, ma'am.

MR. RIPPY: I'm going to object as nonresponsive.

Q. (By Mr. Rippy) Yes or no? Any place in there, to you knowledge, that says you can't work?

A. I'm not sure.

Q. Yes or no do you get Social Security SSI?

A. No.

Q. Yes or no, if you applied for it even?

A. No.

Q. Yes or no, did you renew your master's in registered nursing license?

A. Registered nurse -- professional registered nurse license, and I did not renew it. It's -- I forget what they call it.

Q. That's a no, you didn't renew it. When did you quit?

A. It's not quitting.

Q. When did you quit renewing it? This year, right?

A. No. No.

Q. How many years have you not renewed it? Just one, right?

A. I'm trying to remember when the date was, because the paper --

MR. RIPPY: All right. Judge, I will pass the witness.

THE COURT: All right. Counsel.

A. It might be a few years.

THE COURT: Hold on.

VOIR DIRE EXAMINATION

BY MR. HINDERA:

Q. Ma'am, do any of these records say that you have a disability?

A.   Yes.

Q.   And, in fact, Petitioner's Exhibit 28 says that, correct?

I've now handed you what's been marked as Petitioner's Exhibit 28.  Do you recognize that document?

A.   Yes.

Q.   What is that document?

A.   This is a record from the Mayo Clinic.

MR. HINDERA:  Okay.  I think Mr. Rippy has withdrawn all of his objections, Your Honor, to all of the stack there.  We would ask that --

THE COURT:  Hold on just a moment.  What is the current situation on stipulating to the evidence?

MR. RIPPY:  Well, Judge, we've withdrawn our objection to that one, that one being -- is it 19?  What's the big, thick one right in front of the witness?

MR. HINDERA:  That's 3.

MR. RIPPY:  Okay.  We've withdrawn our objection to 3.  The one currently in Mr. Hindera's hand, I don't know if that one has an affidavit or not, does it?

MR. HINDERA:  It does not.

MR. RIPPY:  We do object to that one.

THE REPORTER:  Excuse me.  I don't have it

marked as 3.

MR. HINDERA: This one right here, this is 3.

MR. RIPPY: Okay. So 3 we don't object to.

THE COURT: We need to be really careful with these exhibits, because you're jumping around so much, the Court is having a hard time staying on the same page, along with the court reporter. So give me just a minute here. I want to catch up. I'm reviewing at the moment Exhibit No. 21. I'm referring to Exhibit No. 20. Give me just a minute, please. I've now reviewed 20.

Now, Counsel, you had made a reference in some of these, there's a reference by a physician of disability. And what exhibit are you saying that that has been represented in?

MR. HINDERA: To me, Your Honor?

THE COURT: No, sir, in the records admitted into evidence.

MR. HINDERA: None that have been admitted so far. The reference is, you will recall Mr. Rippy asked my client in any of these stack of documents here is there anyone who diagnoses you with a disability.

MR. RIPPY: That's not exactly what I said.

THE COURT: No. At this time, Mr. Rippy,

would you like to take the witness on voir dire again?

MR. RIPPY: Yes, sir.

VOIR DIRE EXAMINATION

BY MR. RIPPY:

Q. Yes, sir. Is there, to your knowledge, anywhere in any of the records that have been -- that have been admitted or I guess the one you're holding where it says you can't work, you're unable to hold any kind of job? Is there anywhere that says that?

A. It's evident in there. It doesn't specifically state that.

Q. Do you have any resumes out?

A. No.

Q. Have you -- you've been getting 2,000 a month in spousal support the last two years, right?

A. Yes.

Q. Have you applied for any jobs?

A. No.

Q. Any job?

A. None.

Q. You live at home with your folks?

A. I live in my parents' winter home, and currently they don't live there anymore. But, originally, when I moved there, they were living there part of the year. And then my dad lived with me for --

Q. I don't care who else lived there. You live in one of your parents' home?

A. Yes.

Q. You're not on SSI and you haven't applied?

A. No. I'm ineligible due to my husband's income.

MR. HINDERA: And, Your Honor, we're getting a little far afield on the voir dire.

THE COURT: That's true.

Is that all you have on your voir dire, Counsel?

MR. RIPPY: Yes, sir, Judge.

THE COURT: Thank you. You may proceed with your examination.

CONTINUED DIRECT EXAMINATION
BY MR. HINDERA:

Q. Ma'am, in this record from the Mayo Clinic, does it state that you're disabled?

A. Yes.

Q. And this was in this stack that Mr. Rippy was talking about?

A. Yes.

MR. HINDERA: Your Honor, we would like to have this marked as Respondent's Exhibit -- it is marked. I'm sorry.

We would like to have Respondent's --

sorry, Petitioner's Exhibit 28 admitted into evidence, Your Honor.

MR. RIPPY: And again, is this one with an affidavit or is this one without an affidavit?

MR. HINDERA: He opened the door. He asked my client in this stack of documents here. And that opens the door, Your Honor.

MR. RIPPY: To the one she's holding or the one --

MR. HINDERA: Because he knows that document says she has a disability.

THE COURT: Was that document, Counsel, not filed by business records affidavit?

MR. HINDERA: It was not. We did not get that until last week, Your Honor.

THE COURT: And it was not produced in discovery?

MR. HINDERA: No, Your Honor.

THE COURT: Okay.

MR. HINDERA: But that was in the stack that he referred to, Your Honor. He asked her about it.

THE COURT: The objection to hearsay is sustained. And I believe that was No. 28. 28 is not admitted.

Q. (By Mr. Hindera) Have you been seeing

Claudia -- a licensed psychological counselor?

A. Yes.

Q. And what is her name?

A. Claudia Ghio.

Q. I'm now handing you now what has been marked as Petitioner's Exhibit 2.

MR. HINDERA: And, Your Honor, there is a business records affidavit attached to that.

Q. (By Mr. Hindera) Are those the records of Claudia Ghio?

A. Yes.

Q. And I'm now handing you what has been marked as Petitioner's Exhibit 29. Are those the records -- the latest records we got the other day from Claudia Ghio?

A. Yes.

MR. HINDERA: Your Honor, we ask that Petitioner's 2 and Petitioner's 29 be admitted into evidence.

MR. RIPPY: And I think, Judge, Petitioner's 2 has a business records affidavit, which may or may not have been filed, so we don't object to 2.

29 is apparently some recent addendum without one. We do object to 29.

THE COURT: Do you have any response to the objection, Mr. Hindera?

MR. HINDERA: Well, again, Your Honor, she was asked specifically about those documents by Mr. Rippy. He pointed the documents and said is there something in there that says you can't work. We have a right then to produce those documents into evidence if they reflect on whether she has a disability or not.

THE COURT: Objection to 29 is sustained. 2 is admitted.

(Petitioner's Exhibit No. 2 admitted)

Q. (By Mr. Hindera) Okay. Why have you been seeing Claudia Ghio?

A. For my anxiety, depression, and coping with my chronic pain issues and memory, cognitive memory problems.

Q. Okay. So to get to what Mr. Rippy has been asking you about, you're unable to work because of chronic pain, correct?

A. Yes. Chronic pain and memory.

Q. Ma'am, just answer my question.

A. Yes.

Q. You're unable to work because of chronic pain, correct?

A. Yes.

Q. And that's reflected in those documents that have been admitted, correct?

A. Yes.

Q. You're unable to work because of memory incompetence, I guess.

A. Uh-huh. Yes.

Q. Short term and long term?

A. Yes.

Q. You're unable to work because of the chronic anxiety and depression that you have, correct?

A. Correct.

Q. And at one point, you were diagnosed in those documents with bipolar disorder, correct?

A. I think they -- I don't know if I was diagnosed with that. I think they entertained that, but I would have to see where --

Q. Okay. Do you have hypermobility disorder?

A. I have Ehlers-Danlos syndrome, hypermobility type.

Q. Okay. Does that prevent you from holding down a full-time job or any kind of job?

A. It causes chronic pain, anxiety, and depression.

Q. Have you been diagnosed with chronic fatigue?

A. Not -- yes. Chronic fatigue, yes.

Q. Are you in constant pain for the most part?

A. Yeah. I'm always in pain. It's just the

severity.

Q. Would you please look at this judge and tell him why it's not reasonable to expect that you're going to be able to hold down a job.

A. It's difficult for me to sit longer than 20 minutes without starting to experience severe pain. This is very difficult for me to be in court today. I'll probably be in bed for a few days after because I'm pushing the limit. I can't stand or walk for an extended period of time. I use the cart in the grocery store, and I have handicapped parking. And I try not to use it, unless I'm very fatigued. But I have a limited amount of energy that I have to partition out through the day, as I explain the fatigue. The pain gets worse when I'm sitting in one place, when I'm typing on the computer, my hypermobile fingers and my hands. And I have difficulty focusing and remembering, keeping my mind on track. And even watching T.V., I can't follow a T.V. show through to the end. I just lose track.

Q. Did you enjoy working?

A. Oh, I loved working and I loved going to school. I mean, I was -- I was, you know, in honors, got As in both of my classes. And I was premed in my bachelor's degree.

Q. And if you could hold down a job, would you?

A. I would, yes.

Q. And if you could actually accept a job in good faith, would you have put out resumes this year?

A. Yes.

Q. Are you asking this Court to find that you are unable to work?

A. Yes.

Q. Are you asking this Court to find out that you have a physical or mental disability that prevents you from working?

A. Both.

Q. Okay. How did you get the handicapped parking sticker?

A. Because of my chronic fatigue.

MR. RIPPY: Objection; relevance. Handicapped parking sticker. It just can't be relevant, Judge.

MR. HINDERA: It means the State found that she has --

MR. RIPPY: That's not what it means.

THE COURT: I'm going to go ahead and let her answer as to why she thinks she has a disabled parking sticker.

A. Because of my chronic pain and fatigue.

Q. (By Mr. Hindera) And are you able to meet your

minimum -- to generate sufficient income now to meet your minimum reasonable needs?

A. I mean, I have difficulty doing daily activities, getting my daily activities done in the day. I need assistance with that.

Q. Now, have you created a -- how much do you think you need to live on each month?

MR. RIPPY: Judge, if we're going to read from the proposed disposition, we'll stipulate what his proposed disposition says, not to its truth.

THE COURT: Mr. Hindera, I will take notice of the contents. She thinks -- her representation to the Court based on her proposed decision is that she allows that she needs $3,000 a month from her husband.

MR. HINDERA: Well, no, that's not entirely -- no.

THE COURT: Then you better go ahead and ask questions.

Q. (By Mr. Hindera) Do you need $3,000 total to live on? Is that what you're asking this Court to make sure that you have access to $3,000?

A. My budget is for more than that, but I --

THE COURT: Certainly you may examine the witness, Counsel. I thought if there's a shortcut, we'll take it. If there's not, well, then it's a

questions and answer. You may proceed.

Q. (By Mr. Hindera) And you're not asking Wayne Peck to provide you with $3,000, are you?

A. Well, my -- because of --

MR. HINDERA: I'll strike that question, Your Honor.

Q. (By Mr. Hindera) You want 50 percent of the retirement -- the military retirement, correct?

A. Yes.

Q. And you want Wayne Peck then to make up the rest of that to get you to the level that you're at now?

A. To the 3,000.

Q. Yes, ma'am.

THE COURT: I have a very specific -- and, lawyers, you can provide me this information. When is Mr. Peck going to start receiving his retirement?

MR. RIPPY: August, Your Honor.

THE COURT: In August?

MR. RIPPY: He retires in August, Judge, September 1, 2014.

THE COURT: All right. What's his current amount of support to her?

MR. RIPPY: 2,000 a month in temporary spousal, plus he's been paying the mortgage.

MR. HINDERA: Your Honor --

MR. RIPPY: And if you look at his proposed disposition, that's how much negative he is every month.

THE COURT: Mr. Hindera, all I'm asking -- and let me explain is I'm trying to make sure that your client doesn't go under between now and the time that he actually begins receiving his retirement. So I don't know if you want to argue on that particular point, but that's just a question in the Court's mind. If the Court orders $700 in temporary support, is she going to receive the retirement to supplement that as well? And in the Court's mind, if I don't understand this correctly, I could order an amount that you ask that I order, maybe 700 over and above retirement, and she just gets for the next five months $700. And that's what the Court was trying to clarify. It was to your client's benefit that I ask that question.

MR. HINDERA: Yes, Your Honor. I wasn't objecting to the Court asking the question. I'm objecting to Mr. Rippy always saying that somehow he is paying the mortgage and it's some sort of Augean task when the fact was that's what he wanted. He wanted the house in the mediated settlement agreement.

THE COURT: I understand that you're in the heat of battle, Mr. Hindera. I'm just looking at numbers. If he's providing $2,000 a month and making

the mortgage payment, then the Court -- and he has been making the mortgage payment, then what the Court is looking at is what is the mortgage payment because that's the total package of his support. And so what would that number be?

MR. HINDERA: As of this weekend, we've got an offer and a contract on this house.

THE COURT: That's not what I asked, Mr. Hindera.

MR. RIPPY: Plus it was another 2,000, Judge.

THE COURT: Okay. So how much is the mortgage payment and the 2,000?

MR. HINDERA: 12- or 1400.

A. It was 1100 at first because we had 0 percent interest, but I think it's 1400 now. But that's not the residence I live at. That was the residence he was living at.

MR. RIPPY: Well, no one lives there now, Judge. But if you look at his proposed disposition, he is exactly the amount of the mortgage and taxes underwater every month. So it's 1,505.87, to answer the Court's question.

THE COURT: All right. So he's paying about $3,500 a month in temporary?

MR. RIPPY: That's correct.

THE COURT: That's what I wanted to know.

MR. RIPPY: Yes, sir.

THE COURT: Thank you.

MR. HINDERA: May I approach, Your Honor?

THE COURT: Yes, sir.

MR. HINDERA: Just so we're clear, here's his latest LES.

THE COURT: Is that okay?

MR. HINDERA: Is that okay?

THE COURT: Do you have any objections to this?

MR. RIPPY: Well, it may be what's attached. We've attached an LES to our proposed disposition. I'm not sure if it's the latest one.

MR. HINDERA: I don't believe it's the latest one.

MR. RIPPY: It's the exact same one, so we have no objection.

MR. HINDERA: It is. And, Your Honor, I've also attached here, then, the civilian equivalent, because the fact is Mr. Peck makes a considerable amount of money. Major Peck.

MR. PECK: Mister is fine.

MR. HINDERA: Major Peck makes a

considerable amount of money. We haven't been driving him into the poorhouse. He's been able to a take trips. He's been fine.

THE COURT: Thank you. All right. You may proceed, Counsel.

We're not going to make it. We need to find out what tomorrow's got. Ma'am, why don't you stand up and stretch.

THE REPORTER: Judge, for the record, I just need confirmation about No. 6 and No. 3 on the exhibits.

THE COURT: I did not admit 6, and I did not admit 3. They weren't offered.

MR HINDERA: And I'll make sure we don't get those mixed up, Your Honor.

MR. HINDERA: I'm about to rest. And --

MR. RIPPY: I'm not a hundred percent convinced we won't make it, but 3:45 is a tall order.

THE COURT: Yeah, it is.

(Brief discussion.)

THE COURT: All right. We're going to finish with her. I want to hear from your client, Mr. Rippy. We will have you back here at 1:30 tomorrow. We're going to finish with this witness. The 3:45, 4:00 o'clock is not optional. I must go.

So are you -- I do need to take about a 5-minute break, gentlemen. We probably all do. So just give me a minute. Thank you.

(Recess taken from 3:14 p.m. to 3:23 p.m.)

THE COURT: All right, Mr. Hindera.

Q. (By Mr. Hindera) Ma'am, this Morgan Stanley account that Major Peck says is his separate property that contains the inheritance from his father, what's the name of that account right now?

A. Well, I know it says Morgan Stanley on it. I'm not sure if it says Smith Barney, too.

Q. Did it start out --

A. It started out as Salomon Smith Barney, I think, and then Smith Barney. And then I think it's Morgan Stanley, but it's all the same. It's just they kind of void each other out.

Q. Okay. What monies went into that account?

A. That was in 1995. We opened that account. We went to -- actually, we were in New York and went to the office. And the monies from that account -- in that account were wired from our joint checking account. And it was in the NCIB -- NCNB Bank, which turned into Nations Bank and then Bank of America. It was the same account that we had for --

Q. Did Major Peck receive an inheritance from his

father when his father died? Yes or no?

A. No. Well, he got -- I know he got a life insurance thing that was like $5,000, but I'm unsure of any other.

Q. Okay. Are any of the funds that went into the Smith Barney, Morgan Stanley, whatever that account is, are any of those funds from an inheritance that Major Peck received?

A. Not that I'm aware of. It was when we came back from -- when we came back from the Middle East, the summer we were visiting before we came back from the Middle East.

MR. HINDERA: Your Honor, I will pass the witness.

THE COURT: All right. Your witness, Counsel.

MR. RIPPY: Thank you, Judge. May I proceed?

THE COURT: You may.

MR. RIPPY: All right.

CROSS-EXAMINATION

BY MR. RIPPY:

Q. All right. So, Ms. Peck, the truth is -- and your memory seems pretty good on this point, when you were in New York and you wired in money from the NCNB

account.

MR. HINDERA: Your Honor, we'll object as to the sidebar.

MR. RIPPY: Well, let me ask her.

Q. (By Mr. Rippy) Is your memory good on this point?

A. It's only good because I spoke with -- because of the IRA, I spoke with our financial --

Q. That's a yes or no question. Is your memory good on the point of the 1995 money transfer? Is it good or not?

A. Currently, yes.

Q. And at that time, you transferred money when y'all were in New York from your NCNB account, right?

A. Yeah, our joint account.

Q. And the amount was $66,000, wasn't it?

A. That, I don't recall the exact amount.

Q. So you don't know what the amount was?

A. Well, I wrote it down, but I don't recall it.

Q. Well, the law of Texas allows me to ask for your best estimate. So what is your best estimate of the amount that was transferred into your account?

A. That could be correct about that.

Q. And there's no other source that $66,000 would have come from except for the trust that was established

on the death of Wayne Peck's father; isn't that right?

A. Well, before we went to the Middle East, we both sold both of our cars. And while we were in the Middle East, we both worked and didn't have to pay taxes. And there was -- we had money in a savings account.

Q. So, yes or no, did the money come from selling your cars?

A. Not just the cars, no.

Q. Yes or no, did the money come from just money you had been saving?

A. It was a combination of those things.

Q. Yes or no, did Wayne trust -- Wayne Peck have a trust established for him up on the death of his dad in the early '90s?

A. No.

Q. Yes or no, did Wayne Peck's trust dissolve in 1995 at the time of this transfer?

A. No.

Q. Now, let me ask you this: You say you have a little trouble conducting your daily activities; is that right?

A. Yes.

Q. Your daily activities include motorcycle riding?

A.   You have a picture of me on a motorcycle.

Q.   I sure do.  What is the date of that picture?

A.   That was about --

Q.   What's the date of the picture of you on the motorcycle?

A.   I don't have the date.  I can give you an estimate.

MR. HINDERA:  Your Honor, we're going to object.

A.   No, I can explain this.

THE COURT:  Hold on, ma'am.

MR. HINDERA:  That's fine.

THE COURT:  Let Mr. Hindera object.

MR. HINDERA:  He's asking about a document that I've not seen and asking specifically a date of a document that I've not seen and it's not in evidence.

MR. RIPPY:  And the response is, the question is, What's the date of the picture of you riding a motorcycle?  We don't have to show a picture of a motorcycle.  She admits there is one.  I want to know the date.

THE COURT:  In regards to something that would be based on her personal knowledge, she may testify to that.  As to any pictures that were not produced in discovery, your objection will be sustained,

although it hasn't been offered yet.

MR. HINDERA: And it probably -- this is a good point to make this argument. They did not respond to discovery. Therefore, they do not get to introduce any documents in discovery, as per 192.6.

THE COURT: Mr. Hindera, we're not really there yet. I'm just trying to find -- I think he has asked a question about a motorcycle. And I think under the circumstances, I've sustained your objection as to a picture, which is yet to be offered. But as to the objection to the question, your objection, I do not believe pertains to her testimony and personal knowledge. And in that respect it's overruled.

Now, let's go to work. Thank you.

Q. (By Mr. Rippy) What's the date of the picture of you riding a motorcycle?

A. Of me riding the motorcycle or sitting on the back of a motorcycle?

Q. Either one.

A. Maybe October.

Q. Of what year?

A. Of this past year.

Q. 2013?

A. Yes.

Q. And was there a time when you rode a motorcycle

in October of 2013?

A. For a short period of time on the back of a motorcycle.

Q. Who was on the front?

A. A friend of mine.

Q. Who is that?

A. Mr. Guilamo-Ramos, Jr.

Q. And why would you send a picture like that to your husband?

A. That summer, we were actually under good terms. I had helped him with some depression issues he was having, and he was encouraging me to try to date. And I was actually sending him a picture to show that --

Q. You were out having fun dating, right?

A. -- I had met someone.

Q. Well, the purpose of the picture was to show him you were out having fun dating, right?

A. Yes, because he was encouraging that.

Q. Okay. October of 2013, right?

A. Yes. But that ride was not very -- it wasn't very good. I -- it was very short.

Q. Around the same time -- but you did testify you have trouble remaining seated, right? That was your testimony just 10 minutes ago?

A. Yes.

Q. Around that time --

A. As you can see, I'm sitting now, but I'm having a hard time. Yeah.

Q. Okay. Around the same time -- well, also, about an hour ago you testified you have trouble maintaining focus, you have some memory problems, right?

A. Yes.

Q. And there was a time around the time of the motorcycling dating picture when you ran some license plates and confronted Wayne Peck that he either had a girlfriend or had somebody staying over at y'all's house, you ran her license plates, right?

A. That's incorrect.

Q. Did you call Mr. Peck and tell him the results of running some license plates?

A. I told him that I was informed by someone in the neighborhood that there was a car in the driveway frequently. And I knew about that for a long time. And I didn't confront him until several months, maybe six months after the fact.

Q. And you told him to whom the car was registered, didn't you?

A. It was three people. So I didn't know who the person was. I kind of wanted to get it out in the open and it not have to be a secret. And that was my way of

doing that. It was not under ill intentions.

MR. RIPPY: Judge, I will pass the witness.

REDIRECT EXAMINATION

BY MR. HINDERA:

Q. You didn't get ahold of his commanding officer about him having a girlfriend, did you?

A. Never.

Q. And, in fact, we knew about it months ahead of time, right?

A. I think at least six months.

Q. And when his attorney asked, you know, he would like to start dating, we said if we're going to make him wait two years, go ahead?

A. The only time I threatened --

Q. Now, with respect to this motorcycle, you sat on a motorcycle and you rode for a short period of time, correct?

A. Yes. That day, yes.

Q. Did that cause you any pain?

A. Yeah. I had severe pain in my legs and my butt and my back, but it was just a short ride and gave me a smile.

Q. Just so we're clear, ma'am, you're not what we used to call in the military a malingering malcontent, are you?

A.    I don't know what that is.

Q.    If you could work, you would work, would you not?

A.    Of course.    I've worked since I was 15.

MR. HINDERA:    Your Honor, that's all we have.

THE COURT:    All right.

MR. RIPPY:    No further questions for this witness, Judge.

THE COURT:    I believe we have about 10 minutes, so gentlemen, you can pack it up.    We'll see you again at 1:30.    We are in recess.

(Court recessed until 3/18/14, 1:30 p.m.)

REPORTER'S CERTIFICATE

STATE OF TEXAS                    *

COUNTY OF WILLIAMSON        *

        I, Virginia L. Bunting, Deputy Court Reporter in and for the County Court at Law No. 4 of Williamson County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel for the parties in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

        I further certify that this Reporter's Record truly and correctly reflects the exhibits, if any, offered by the respective parties.

        WITNESS MY OFFICIAL HAND on this the 18th day of September, 2014.

                              /s/ Virginia L. Bunting
                              Virginia L. Bunting, CSR
                              Texas CSR No. 5704
                              Expiration Date:  12-31-15
                              P.O. Box 405
                              Liberty Hill, Texas  78642
                              (512) 940-6597

# Exhibit B

REPORTER'S RECORD
VOLUME 3 OF 9 VOLUMES

CAUSE NO. 13-0926-FC4
COURT OF APPEALS NO. 03-14-00440-CV

| | |
|---|---|
| IN THE MATTER OF | * IN THE DISTRICT COURT |
| | * |
| THE MARRIAGE OF | * |
| | * |
| NANCY MARIE PECK | * WILLIAMSON COUNTY, TEXAS |
| | * |
| AND | * |
| | * |
| WAYNE CODY PECK | * COUNTY COURT AT LAW NO. 4 |

REPORTER'S RECORD

MARCH 18, 2014

JUDGE'S RULING

On the 18th day of March, 2014, the following proceedings came on to be heard in the above-entitled and numbered cause before the Honorable John B. McMaster, Judge Presiding, held in Georgetown, Williamson County, Texas.

Proceedings reported by computerized stenotype machine.

APPEARANCES


MR. JOHN J. HINDERA, J.D., PH.D.
THE HINDERA LAW FIRM
SBOT NO. 24036782
4425 MoPac South
Building 2, Suite 107
Austin, Texas  78735
(512) 899-3631
(512) 899-3618 Fax
ATTORNEY FOR THE PETITIONER

MR. FELIX RIPPY
RIPPY, HENDERSON & TAYLOR, PC
SBOT NO. 16937400
3000 Joe DiMaggio, Suite 4
Round Rock, Texas  78665
(512) 310-9500
(512) 310-2580 Fax
ATTORNEY FOR THE RESPONDENT


ALSO PRESENT:

Mr. Wayne Cody Peck
Ms. Nancy Marie Peck

# CHRONOLOGICAL INDEX

## VOLUME 3 OF 9
### (FINAL HEARING)

March 18, 2014                                          Page   Vol

Petitioner Rests............................. 10     3


### RESPONDENT'S DIRECT EVIDENCE

| WITNESS | Direct | Cross | VD | Vol |
|---------|--------|-------|-----|-----|
| Wayne Cody Peck........... | 10,40 | 30,38 | 37 | 3 |
| All Close................... | | | 42 | 3 |
| Judge's Ruling................. | | | 42 | 3 |
| Proceedings Concluded............... | | | 45 | 3 |
| Reporter's Certificate................ | | | 46 | 3 |

## ALPHABETICAL WITNESS INDEX

|  | Direct | Cross | VD | Vol |
|---|---|---|---|---|
| Wayne Cody Peck............ | 10,40 | 30,38 | 37 | 3 |

## PETITIONER'S EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|-----|-------------|---------|----------|-----|
| 3 | Records (Austin Pain Associates, Jessica Horwath, PA-C) | 8 | 9 | 3 |
| 17 | Records (Jason Boothe, M.A., L.P.A.) | 37 | 38 | 3 |
| 30 | Defense Finance and Accounting Service Military Leave and Earnings Statement | 31 | 33 | 3 |
| 31 | Handwritten note | 34 | 35 | 3 |
| 32 | Invoices (The Hindera Law Firm) | 41 | 41 | 3 |

## RESPONDENT'S EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|-----|-------------|---------|----------|-----|
| 1 | W-2 (Wayne Cody Peck) | 40 | 40 | 3 |
| 2 | Last Will and Testament (Milford Peck) | 16 | 16 | 3 |

PROCEEDINGS

MARCH 18, 2014

THE COURT: I believe it's your witness.

MR. HINDERA: I'm going to call Mr. Peck, I guess. But, Your Honor, we had some issue that I need to put on the record with numbering the exhibits and what have you. My staff put a number up here. It's different than the number on the official.

THE COURT: That's okay, Counsel. We go by the number that the court reporter marks. So are they not properly marked?

MR. HINDERA: They're properly marked. I referred to them differently. So we just need to put on the record that No. 18 is actually No. 20, and No. 20 is actually No. 22, and No. 6 is actually No. 3. And apologize to the Court. But the court reporter and I worked it out last night.

THE COURT: But that's about as clear as mud. So where are we?

MR. RIPPY: Okay. Judge, I think I agree with all of that, and I think I know what he's talking about even. But there's five -- but there's five total admitted exhibits, correct?

THE REPORTER: Yes.

THE COURT: Okay. And those admitted

exhibits are by number?

THE REPORTER: I have No. 2, No. 20, No. 23, No. 22, and No. 21.

MR. RIPPY: That comports with what I have, but is that wrong?

MR. HINDERA: No. Those were the ones that were admitted. And then No. 3, which was referred to in questioning by Mr. Rippy and by myself with my client here, Ms. Peck, wasn't admitted, and I didn't offer it, so I would like to offer it now.

THE COURT: I believe that you offered it and there was an objection made, I believe, on 3.

MR. HINDERA: But, Your Honor, it has the affidavit and we questioned her on it. It was the second -- the supplemented records that didn't come in.

MR. RIPPY: Well, I think the objection was that that couldn't possibly have been filed because of its size.

THE COURT: We're probably going to have to go back into the record since my record is so utterly convoluted at this point in time that we can't even seen to ascertain what our exhibits are.

Is -- gentlemen, you need to get that straightened, and I will give you about 5 minutes to do so. I'm going to take a short break while you handle

that.

(Break taken from 1:44 p.m. to 1:47 p.m.)

THE COURT:  All right.  Do we have that squared away?

MR. RIPPY:  Yes, sir, Judge.

THE COURT:  You can have a seat.  I do not recall admitting three.

MR. HINDERA:  It was offered, and Mr. Rippy took the witness on voir dire, and then it was never ruled on, but they've stipulated that 3 is fine.

MR. RIPPY:  And the Court is correct. There was no ruling admitting it, but we're withdrawing any objections and stipulating that it may be admitted and it's admissible and it can be admitted.

THE COURT:  You're offering it, Counsel?

MR. HINDERA:  Yes, Your Honor.

THE COURT:  3 is admitted.

(Petitioner's Exhibit No. 3 admitted)

MR. HINDERA:  Thank you, Your Honor, and I apologize for --

THE COURT:  The confusion.

MR. HINDERA:  It was entirely our doing.

THE COURT:  Yes, sir.

All right.  Your next witness.

MR. HINDERA:  Your Honor, at this point, I

think we will go ahead and rest.

THE COURT: Very well. Counsel.

(Petitioner rests)

MR. RIPPY: Yes, sir, Judge. We would call Major Peck.

THE COURT: Major Peck, having been previously sworn.

MR. RIPPY: Judge, may I proceed?

THE COURT: Yes, you may.

WAYNE CODY PECK,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. RIPPY:

Q. All right. Major Peck, can you give, for the record, your full, true, and correct name, please.

A. Wayne Cody Peck.

Q. And you heard the testimony about your residing in Williamson County for at least six months and your marriage being insupportable and there being no reasonable expectation of reconciliation, and you agree with all of that, don't you?

A. I do.

Q. Now, you have been married, I guess, for coming up on 25 years to Nancy Peck, who is the Petitioner in this case, correct?

A.   That's correct.

Q.   And you've also agreed for the last roughly decade of that period of time she has not worked; isn't that right?

A.   That is correct.

THE COURT:  And why is that?

A.   We came -- one, she had some medical issues, and we came to an agreement.  I was pressuring her to work.  And we came to an agreement around 2002, 2003 time frame that we would have the kind of marriage like more a traditional marriage where one stays home and cares for the house and the home and that part of it and I would be the one that goes out and the breadwinner, so to speak.

Q.   (By Mr. Rippy)  Is it a fair statement it was a mutual agreement between the two of y'all?

A.   Yes.

Q.   She has a master's degree, I believe, as do you; isn't that right?

A.   That's correct.

Q.   And it's your opinion that she could, in fact, do all kinds of jobs; isn't that true?

A.   That's true.

MR. HINDERA:  Objection, Your Honor; calls for speculation.

THE COURT: Sustained. Just rephrase your question, please.

MR. RIPPY: Yes, sir, Judge.

Q. (By Mr. Rippy) Could she work?

A. Yes.

Q. What kinds of jobs do you think she could do?

MR. HINDERA: Objection, Your Honor, if I can take the witness on voir dire? I mean, this is way beyond his scope as to what she could do. And it's speculation. And it's speculation as far as his -- he's not an occupational therapist or anything.

MR. RIPPY: Judge, he doesn't have to be an expert to testify what kind of job she can do.

THE COURT: I don't really -- at this point in time, Counsel, I'm going to sustain it. Let's move on.

MR. RIPPY: Yes, sir.

Q. (By Mr. Rippy) Have you had some recent experience, Major Peck, with furniture being moved out of your house?

A. I have.

Q. And what experience was that?

A. I got a text from both Nancy and my Realtor that she was moving some various things out of the house.

Q.   Do those things include a heavy hutch with books?

MR. HINDERA:  Your Honor, we're going to object as to hearsay, unless Major Peck is going to say that he witnessed her carrying something.

MR. RIPPY:  It's not hearsay.  He's witnessing the hutch disappeared, Judge.

THE COURT:  All right.  If that is based on his personal knowledge, the objection is overruled.  If it's based on a statement made by a nonparty, I'm going to sustain it.

MR. RIPPY:  Yes, sir, Judge.

Q.   (By Mr. Rippy)  So did the hutch disappear or not?

A.   Yes.  I went by there today.  I've got pictures.

Q.   Did Nancy --

MR. HINDERA:  We'll renew our objection, Your Honor, that the hutch -- because the hutch is missing doesn't mean that my client --

THE COURT:  Overruled.  Have a seat, please.

Q.   (By Mr. Rippy)  Did Nancy Peck text you after the hutch went missing and say she moved it?

A.   Yes.  And a Realtor did as well.

Q. Did you hear Nancy Peck's testimony that there was no trust when you inherited your dad's estate or one-fourth of your dad's estate? Did you hear that testimony?

A. I did.

MR. RIPPY: Judge, may I approach the witness?

THE COURT: You may.

Q. (By Mr. Rippy) Let me show you what's been marked for identification purposes as Respondent's Exhibit 2 and ask you if you recognize that?

A. I do.

Q. What is it?

A. That's the last will and testament of my father.

Q. Does it set up a trust whereby you receive one-fourth of the estate?

MR. HINDERA: Objection, Your Honor. He's asking him about the contents of a document that hasn't been admitted into evidence. We're going to object to this document we talked about yesterday because they didn't answer any discovery. So they're not allowed to bring in any documents under 192.6 in the Civil Procedure Rules.

MR. RIPPY: All which would be true if she

didn't take the stand and lied about it, at which point you get to be debunked.

MR. HINDERA: I'm not certain where in the rules it says that particular -- I've got them right here. He gets to testify that she did, but as far as --

THE COURT: Counsel, I determine as to what he can testify to and what he doesn't testify to. That's a judicial function. Do you have an objection and a cohesive, coherent response to the objection?

MR. HINDERA: Yes. I do not believe it comes in under 192.6A.

THE COURT: Overruled.

Q. (By Mr. Rippy) Does that document that you're holding give you one-fourth of the estate of your father?

A. It does.

Q. Is that the money that went into the account that is attached to your proposed disposition of issues?

A. It was.

Q. Is there an amount of money on the last page of the certified copy of the inventory that you're holding?

A. Yes. It says the total value --

Q. I didn't ask you that yet.

A. All right.

MR. RIPPY: Judge, we move for admission of

what's been marked as Respondent's 2.

THE COURT: Judge notes that under that one you've lodged an objection to the entry of that exhibit, Counsel, for your record. I've overruled your objection and I'm admitting it.

MR. HINDERA: Your Honor, I'm just --

THE COURT: You may make a bill later if you wish, Counsel.

MR. HINDERA: I don't think there's any need to do that, Your Honor, but I've never seen this before. I've just taken a second to read it. It was handed to me maybe 2 minutes ago.

MR. RIPPY: And we couldn't possibly have anticipated that she was going to deny the existence of something this important. He --

MR. HINDERA: She did not.

THE COURT: Gentlemen. Mr. Hindera, I will allow you read the document. I'm withdrawing my ruling admitting it until you've had an opportunity to view the document and lodge any objections that you might have.

MR. HINDERA: Your Honor, we'll renew the same objection. It's been overruled, so...

THE COURT: Very well. It's admitted.

MR. RIPPY: Thank you, Judge.

(Respondent's Exhibit No. 2 admitted)

Q.   (By Mr. Rippy)  What's the amount of money that you split four ways there on the last page of the certified copy of the inventory?

A.   It says --

THE COURT:  Before we go there, was that exhibit marked?

MR. RIPPY:  Yes, sir, Judge, that's Respondent's 2.

THE COURT:  2.  Thank you.  Now you may answer.

A.   It states $338,891.19, which was split four ways after funeral costs and settling any debts -- the small amount of debts within the family estate.

Q.   (By Mr. Rippy)  Did you receive one-fourth of that roughly $313,000 amount?

A.   That was around 69,000.  I said 67 yesterday. I was mistaken.  It was 69.

Q.   Is that your one-quarter of the net estate?

A.   Yes, sir.

Q.   Is that what went into the Smith Barney, Morgan Stanley account that is attached to your Proposed Disposition of Issues?

A.   Yes, sir.

Q.   Now, you also heard your wife, Nancy Peck, testify that she's got mental issues that may prohibit

her from working or make that difficult. Did you hear that testimony?

A. Yes, sir, I did.

Q. Have you -- we've heard about your testimony and the furniture, but I'm talking about mentally, have you had some experience with Nancy Peck recently that would indicate that she's got a great deal of mental acuity or alertness?

A. We've communicated off and on quite frequently during the past two years. We've met in person. We have sometimes -- a few times in your presence and yours as well. And the -- in person, and text, and phone, yes, we have. I have.

Q. The last time that you came to court was when?

A. I think it was over a year ago, last -- it was like 18 months ago, something like that.

Q. Now, you've heard that characterized as you were trying to wriggle out of or get out of a mediated settlement agreement? You heard that characterization, did you not?

A. Yes, sir, I did.

Q. Why were you in court a year ago?

A. The -- when we had the -- per the mediated settlement agreement that we came to the conclusion during the first mediation, she was allowed a number of

items on the list. There was a list of 10 items. I forgot exactly. They're in the agreement.

Q. Okay. Let me short-circuit this. Missing furniture, again, is that why you were in court?

A. Yes. There were a number of items taken that were not on that list.

Q. Did there come a time at which you returned from an MBA program you were attending in London?

A. That's correct, sir.

Q. And at that time, how long had you been back before Nancy Peck ran the license plate of a car in your driveway?

A. I got a text stating, a few hours after I returned from London, "Welcome. How is your reunion going," with the implication being she knew that I was reuniting at my house with Tammy. In fact, there was a sign within the house that said welcome home. So I can only -- I don't know how she saw that. And then the next day, I got a text saying, Who is Tammy Horton, Brad Williamson, or Sydney Hudson, which is my friend and her ex-husband and her eldest daughter. My only -- the only way she could have got that is she ran the plates of the car, the people that are registered to that car.

Q. Okay. And how long since you returned from London happened --

A.    That was the next morning, correct.

Q.    Watchfully; is that a fair statement?

A.    Yes.

MR. RIPPY:    Judge, may I approach the witness again?

THE COURT:    You may.

Q.    (By Mr. Rippy)    What I'm showing you is your Proposed Disposition of Issues.   It's in front of the Court, and I think it's in front of opposing counsel.   I know it's in front of me.   And is it in front of you?

MR. HINDERA:    It hasn't been filed -- it's been filed.   It has not been admitted into evidence.

THE COURT:    Let me explain, Counsel.   The Court has not -- those are trial aids.   You don't have to mark your proposed disposition.   That's just your wish list and it's you asking what you want.   It's like an opening statement.   I don't take it as evidence, but it is a trial document and it gets filed.   And if you have one, and I think you do, you don't have to mark it.

MR. HINDERA:    I understand, Your Honor, but he wants to ask him about a document that's attached to that.   And those documents have not been admitted into evidence for consideration by this Court today.

THE COURT:    What documents would be attached to it since I haven't seen the exhibit?

MR. RIPPY: His leave and earning statement, the Morgan Stanley account. There's several documents, but there's nothing that --

THE COURT: Why don't you let Mr. Hindera -- have Mr. Hindera have a look at it.

Mr. Hindera, have you seen it?

MR. HINDERA: I have seen his proposed disposition, Your Honor.

THE COURT: But not the attached exhibits?

MR. HINDERA: There were attachments to it, but they were not -- we propounded discovery to this party. This party never answered discovery. Now, the rules are real clear. He doesn't get to admit it if it wasn't produced during discovery.

MR. RIPPY: If it was requested. And that's the purpose of a motion to compel, which was never filed. And, of course, I wasn't on the case back then, so I don't really -- we may have had a discovery hearing, for all I know. The point being, we have no evidence that anything like this was requested. So you can't just say it wasn't produced. You have to show there's a request. That's why we have motions to compel.

MR. HINDERA: And I have -- in fact, our discovery request --

MR. RIPPY: That's why we have a motion to compel at a separate hearing from the trial so we don't do this.

Judge, I think we can short-circuit this, though, 815 of the local rules, which I'm pretty familiar with since I was on the committee that wrote them, says exactly what the Court said. These are a trial aid. They can be used as evidence, but they're not marked as evidence, nor are they filed with the District Clerk.

THE COURT: Well, except, Mr. Rippy, on that one, it's including some documents that are -- that are not a proposed disposition. They're actually exhibits that need to be separately marked and admitted.

So I will ask that you take the documents -- the supporting documents off of the exhibit, and you may question him in that regard. Mr. Hindera's objection is sustained.

MR. RIPPY: Yes, sir, Judge.

THE COURT: Why don't you go ahead and come -- I will allow you to approach the witness, Mr. Rippy, remove those attachments, and you may then resume your examination of the witness.

MR. RIPPY: Sure.

THE COURT: Now, show the exhibit to

Mr. Hindera so Mr. Hindera knows.

MR. RIPPY: And, Judge, we did exchange these.

MR. HINDERA: We did.

THE COURT: The attachments, Mr. Hindera, have been removed. Your objection is sustained. The proposed disposition now has no attachments. It's just the form promulgated by the local rules.

THE WITNESS: Your Honor, can I go grab my glasses, if that's okay?

THE COURT: You certainly can go get your glasses.

Q. (By Mr. Rippy) All right. So returning to the proposed support decision, I think which is in front of all of us now, Page 1, nothing too informative there.

Page 2, is that your gross wages as of your last LES, 8304 per month?

A. Yes, sir.

Q. Does that make on Page 4 your net wages 6065.98 per month?

A. Yes, sir.

Q. Given the expenses on Pages 4, 5, and 6, are you about $1,500 a month negative?

A. That's correct, sir.

Q. How have you been footing the bill for the

basically $1,500 as exactly your mortgage? How have you been doing that?

A. Running up credit card debt.

Q. Are you asking the Court, then, with regard to debt to give each party the credit card debt or other debt in his or her name?

A. Just the credit card debt that we went into the initial two years ago, which is 19ish thousand.

Q. Well, that's what I'm asking you.

A. Yeah.

Q. Are you personally willing to take that $1,500 a month credit card debt that you've run up the last couple of years?

A. Yes. I'm not asking her to pay that.

Q. Let's turn now to Page 8, which is your Proposed Disposition of Other Issues, and let's just go through this in five minutes or less and make sure you ask the judge for everything that you want.

Paragraph 1, your wife gets 20/20/20 lifetime TRICARE medical coverage, correct?

A. That's correct.

Q. And by the way, you know, we've heard a little bit of characterization of you not winning the Albert Schweitzer Award or being terrifically generous to wait two years to make sure that when you get divorced she

gets this, and certainly that was your mediated settlement agreement?

MR. HINDERA: We'll object to the sidebar, Your Honor.

THE COURT: Sustained.

Q. (By Mr. Rippy) You could have retired, could you not?

A. I could have retired before she --

MR. HINDERA: We'll object to relevance, Your Honor.

MR. RIPPY: I agree, Your Honor. His Albert Schweitzer menial state, that's not my characterization.

THE COURT: I'm going to overrule that objection, because, Counsel, your -- because of the alimony issue. And I'm going to let him testify in that regard because of the equity involved. Your objection in that regard on relevance is overruled.

MR. HINDERA: Thank you, Your Honor.

Q. (By Mr. Rippy) Okay. So Major Peck, you could have retired, couldn't you?

A. I could have.

Q. And you still would have gotten your pension, but she wouldn't have gotten the 20/20/20 lifetime TRICARE?

A.    She would have gotten half my pension but not the medical.

Q.    Well, let's explore that, too.  She wouldn't have gotten more than half your pension because the military simply won't allow that regardless of what a state order says.  Isn't that a fair statement?

A.    That's a fair statement.

Q.    All right.  The bottom of Page 1 of 3, Proposed Disposition of Other Issues, the Survivor Benefit Plan designation, that's what you're proposing to do, pay half of that; is that right?

A.    If she wants.

Q.    You're willing to pay half?

A.    I'm willing to pay half.

Q.    All right.  Top of Page 2, the house proceeds will not be split 50/50.  You're willing to split them 60/40 in your wife's favor; isn't that right?

A.    That's correct.

Q.    You want to be awarded the Hyndai and her the Nissan; is that right?

A.    That's correct.

Q.    No. 5 on Page 2, the Morgan Stanley account, that's the account that was set up by your late father's will; is that right?

A.    That's correct.

Q.   And your share of that was not 65,000 as that says, it was 69; is that your testimony?

A.   That's my testimony.

Q.   The other accounts, though, it says split 50/50.  You're willing to split all other accounts 60/40 in your wife's favor except the one that you're admitting is her separate property, right?

A.   That's correct.  She can have that.  That's hers.

Q.   That takes us through numeral 7 there on Page 2.  Frequent flier miles, again, you're saying it's split evenly in this proposed disposition, but you're willing to give her all of the remaining frequent flier miles, right?

A.   It's over 150, so it's more than half of what it was when we split.  So yes.

Q.   And the reason it's not 300,000 anymore is you flew to London for that aforementioned MBA program, right?

A.   And a couple of other trips, yes.

Q.   Credit card debt, you're willing to pay all debt in your name; is that right?

A.   That's correct.

Q.   Now, bottom of Page 2, with regard to alimony, your proposal is exactly what's written here; is that

right? You're willing to get her up to 2,000 a month regardless of whether your retirement 50 percent that goes to her is 1,000 a month, or 1,500, or 1,700? You will make up the difference and make sure she gets 2,000 a month for five years; is that your testimony?

A. Yes, sir.

Q. Because you've already done it two years during the divorce; is that your offer?

A. Yes. And that will also pay the full $2,000 until my retirement in August.

Q. Oh, so before -- well, that's important. Before your retirement in August, even though you're getting zero retirement, you'll continue to pay her 2,000 a month, and you'll be paying the whole 2,000 a month. And that -- but you're willing to do that; is that right?

A. Yes, sir.

Q. Okay. The personal property will be or already has been divided; is that your testimony?

A. The three items listed on here is still at the house and my personal effects and clothes. I think that's all. All of the stuff that's listed on here is still there. Except for I don't -- I had all of my schoolbooks and papers in the hutch that was moved. I would like those back. I don't know where they are.

Q. Okay. It sounds like except for schoolbooks and a weight set that she can't possibly have any interest in, personal property has been divided; is that your testimony?

A. Yes. And a Persian rug.

Q. The chart, the spreadsheet there on Page 3 of 3 shows that she, being your wife, would get approximately, by that calculation, 70 percent of the community marital estate. And, in fact, it's worse than that, it's more than 70 percent because you're dividing the house and the account 60/40 in her favor, but you're willing to do that, right?

A. That's correct.

Q. Okay. Last thing, Major Peck. You remember the motorcycling picture when she sent in late, I guess October it was in 2013, a picture of herself on a motorcycle with somebody she was dating, right?

A. Or whoever, yes.

Q. And she went on allegedly you heard the testimony about a short motorcycle ride?

A. Yes.

Q. Did she tell you where she went?

A. She said she went to Burnet.

Q. Burnet, Texas?

A. Burnet, Texas.

Q.   And back.

A.   And back.

MR. RIPPY:  All right.  Judge, I will pass the witness.

CROSS-EXAMINATION

BY MR. HINDERA:

Q.   Major Peck, I've marked this exhibit as No. 30. And the second page of that exhibit, do you recognize that?  That's your LES, right?

A.   Yes, LES.  I think I provided that to you guys.

Q.   Now, the LES that you get, because I'm having trouble figuring out where 8304 comes from that's in your pretrials, the "BAS" that you get, which is Basic Army Assistance, right?

A.   I think.

Q.   But that's the food and that kind of stuff, correct?

A.   Yes.

Q.   That allotment is not taxed, is it?

A.   I don't think so.

Q.   Okay.  And the "BAH" there is not taxed, either.  In fact, that's for a housing allowance, correct?

A.   That's for housing, and I don't believe it's taxed, either.  I think you're right.

Q. Now, are you familiar with how you change -- how you equate the BAH and BAS to the civilian equivalent?

A. No.

Q. Well, if you take -- if the BAH is not taxed, then you simply divide the marginal tax rate into the BAH. Have you ever heard of that?

A. No, sir.

MR. HINDERA: Your Honor, I'm going to ask that Petitioner's Exhibit 30 be admitted into evidence. And it's the LES, plus the calculations to arrive at the civilian equivalent.

THE COURT: And what's the number on that exhibit, Counsel?

MR. HINDERA: This is No. 30.

MR. RIPPY: Well, I guess our objection is calculation by whom? I suppose I would -- if there were the producer of this hearsay document here, I would cross-examine him about how do you convert it.

MR. HINDERA: I did it. And I did it according to the 1991 article by Mark Sullivan in the Army Times.

THE COURT: Well, Counsel, that falls within the province of double hearsay.

MR. HINDERA: I understand. I would be

glad to --

MR. RIPPY: Well, Judge, it's a document. I can't cross-examine the document. I can't swear in Mr. Hindera and cross-examine him and he can't be a fact witness. So I'm kind of -- I see what's happening, he's trying to show that if you make a certain amount of money in the military, it's more if you're a civilian, but man -- Judge, I would cross-examine somebody if they were arguing dollars are different for military people.

MR. HINDERA: Well, in fact, they are, Your Honor, because --

THE COURT: Before we begin arguing that, Counsel --

MR. HINDERA: Pardon?

THE COURT: Before we begin arguing that, Counsel, I don't believe that there is testimony. And if you're getting ready to testify, I believe that that would become -- that would complicate things a bit.

MR. HINDERA: It would. And let me just introduce the LES.

MR. RIPPY: That's fine.

MR. HINDERA: That was one of the attachments that we took off of our proposed disposition, so we have no objection.

THE COURT: And what's the number on the

LES?

MR. HINDERA: It is 30, Your Honor.

THE COURT: All right.

MR. HINDERA: And I've taken off my calculations there.

Q. (By Mr. Hindera) Would you agree with me, Major --

THE COURT: Hold on because I haven't admitted your exhibit yet.

MR. HINDERA: I apologize.

THE COURT: You move the admission of 30; is that correct?

MR. HINDERA: Yes, Your Honor.

THE COURT: 30 is admitted.

(Petitioner's Exhibit No. 30 admitted)

Q. (By Mr. Hindera) Now, Major Peck, this all began when you asked your wife to move out, correct?

A. Well, I guess, or when I asked her for a divorce.

Q. Okay. You negotiated with the therapist, that you both were seeing, to have her move out of the house in December of 2011 for two weeks, correct?

A. I guess.

MR. RIPPY: Well, I guess our objection to this is relevance. I don't want to retry the temporary

orders, so I'm not sure why who moved out in 2011 is relevant to anything.

MR. HINDERA: He asked him about the temporary. There are no temporary orders other than the mediated agreement. I don't want to take up a lot of time, but Mr. Rippy characterized it a certain way. He raised the issues.

THE COURT: What issue is that?

MR. HINDERA: Of how generous Mr. Major Peck has been throughout this affair.

THE COURT: Res ipsa loquitur. I don't particularly see it as being -- go ahead, Counsel. The objection is overruled.

What's the number on that exhibit?

MR. HINDERA: This is No. 31. And I'll make this quick, Your Honor. I've just got these documents to put in.

Q. (By Mr. Hindera) Mr. Major Peck, is that the document that you created?

A. Yeah.

Q. And, in fact --

MR. HINDERA: Your Honor, we would ask that No. 31 be admitted into evidence.

THE COURT: 31 is admitted, I believe. I already --

MR. RIPPY:  No objection, Judge.

THE COURT:  All right.

(Petitioner's Exhibit No. 31 admitted)

MR. HINDERA:  Do you want to take a look at it?

THE COURT:  I believe he's seen it.

Q.    (By Mr. Hindera)  And, in fact, she moved out -- you moved -- strike that.

She moved out, then, on the 16th of December, did she not, that weekend?

A.    I assume that's correct.  That sounds right.

Q.    Now, she moved out on the 16th of December, and you had negotiated that deal with Claudia Ghio and Mr. Boothe -- Jason Boothe, correct?

A.    I remember Jason.  I don't remember if Claudia was there, but I will say she was.  I don't remember that.

Q.    Okay.  Now, you changed the locks on the 27th or the 28th of January, correct?

A.    I don't remember the exact date.  I did change the locks.

MR. HINDERA:  May I approach, Your Honor?

THE COURT:  You may.

Q.    (By Mr. Hindera)  Sir, let me hand you what's a text message between you and your wife.

A. Okay.

Q. And does that refresh your memory as to whether you changed the locks?

A. This would be a Blackberry. I don't have -- that's not a Blackberry, so I don't know what that is.

Q. This is not a text from you?

A. It could be, but it says sent from a Blackberry. I had an iPhone. I don't know about that.

Q. Is it fair to say that you changed --

A. I'm not going to deny that I changed the locks. So whatever that says.

Q. Now, how long did you see Jason Boothe? How long were you guys in marital counseling?

MR. RIPPY: Judge, objection; relevance. My goodness.

MR. HINDERA: I will be glad to show the Court here in just a second, Your Honor, to tie that up.

Q. (By Mr. Hindera) Let me begin it this way: Did you see Jason Boothe in part to deal with my client's infirmities?

A. I saw Jason Boothe because we had severe marital difficulties, and it was couples' counseling.

Q. I'm handing you now what's been marked as Petitioner's Exhibit 17.

MR. HINDERA: And there is a business

records affidavit attached to that and filed, Your Honor.

Q. (By Mr. Hindera) Those are Jason Boothe's notes, correct?

A. Okay.

MR. HINDERA: Your Honor, we would ask that Petitioner's Exhibit 17 be admitted into evidence.

MR. RIPPY: Judge, can I take the witness on voir dire for a second about this?

THE WITNESS: I've never seen this before.

MR. RIPPY: Well, that wasn't my question.

VOIR DIRE EXAMINATION

BY MR. RIPPY:

Q. My question is: What's the date of that?

A. This says January 21st of 2012.

MR. RIPPY: Judge, that's the objection. Two-and-a-half-year-old marital counseling records' relevance.

MR. HINDERA: It is relevant, Your Honor, because he deals with the issue of pain and caregiving that he was supposed to be doing for my client. The fact is he knew this -- he knows and knew that this woman is infirm and is disabled, and that's what part of the counseling was about.

THE COURT: I'm going to overrule the

objection. What's your number on that, Counselor?

MR. HINDERA: 17, Your Honor.

THE COURT: Your objection, Mr. Rippy is noted. 17 is admitted.

(Petitioner's Exhibit No. 17 admitted)

CONTINUED CROSS-EXAMINATION

BY MR. HINDERA:

Q. And, sir, would you read that highlighted portion there for the Court?

A. "To better understand pain/caregiver relationships and issues."

Q. In fact, that was one of the issues that you had throughout the marriage was Ms. Peck, because of her physical condition, could not be intimate with you on a regular basis, could she not?

A. I do not ever think that was because of the physical issues. That was a personal choice of hers.

Q. Okay. But you would agree, in fact, that was part of the issue was how you were dealing with her physical infirmity, as per those notes and other notes in there?

A. I guess. I mean, it's -- did we talk about her issues, sure.

Q. And just so we're clear, you agreed she didn't have to work?

A.    I made the --

Q.    That's what you told your attorney?

A.    Yes, and I just said that up here.  Yes.

MR. HINDERA:  Your Honor, I think that's all we have for this witness.

THE COURT:  Very well.  Anything else, Mr. Rippy?

MR. RIPPY:  Just very, very briefly, Judge.

I'm going show the witness what's going to be marked as our Respondent's No. 1, since Court and Counsel may be wondering why we started with No. 2, which is his W-2, just to show the Court the LES that's now been admitted.  That's not what we used to calculate his monthly income.  We used his 2013 W-2, because the LES, of course, he didn't make that amount of money every month.  And so we're just showing where our number came from on our proposed disposition.

THE COURT:  And your objection, Counsel?

MR. HINDERA:  The numbers there are misleading as we talked about, Your Honor, because the W-2 only deals with taxable income.  And the bulk of his income is from -- not the bulk, but about 25 percent of his income or more is nontaxable.  Therefore, it doesn't show up in the W-2.

THE COURT:  Objection is overruled.  It's

admitted.

REDIRECT EXAMINATION

BY MR. RIPPY:

Q.   Major, what is that?

A.   It's my W-2.

Q.   And is that your W-2 for 2013?

A.   That's correct.

Q.   And that's how we calculated your net gross income, divided the Social Security wages there by 12?

A.   Yes, sir.

Q.   But the Court has -- you understand, you're leaving earnings that shows you've got a BAH allowance, as everybody does basically in the military, right?

A.   That's correct.

MR. RIPPY:  Judge, I would offer Respondent's 1.

MR. HINDERA:  No objection, Your Honor.

THE COURT:  1 is admitted.

(Respondent's Exhibit No. 1 admitted)

MR. RIPPY:  No further questions for this witness.

THE COURT:  All right.  Mr. Hindera, do you have any additional questions you wish to ask this witness?

MR. HINDERA:  No, Your Honor.

THE COURT: You may step down. Your next witness, Mr. Hindera.

MR. HINDERA: I just have myself on attorney fees.

THE COURT: You may testify on attorney fees from a seated position, Counsel.

MR. HINDERA: Your Honor, the total amount that Ms. Peck has paid is $39,417. Now, in part -- and I would like to have this admitted into evidence here. This is No. 32.

MR. RIPPY: Sure.

MR. HINDERA: I would ask that No. 32 be admitted, Your Honor.

MR. RIPPY: No objection, Judge.

MR. HINDERA: And I would like to pull out one -- that's the sum total of the bills. We issued five bills with Ms. Peck, but the one that is more relevant than the others -- and I would like to just give it to the Court as a courtesy is this June 14th, 2012. Now, it's in this document here.

THE COURT: Which I have already admitted.

MR. HINDERA: Yes.

(Petitioner's Exhibit No. 32 admitted)

MR. HINDERA: And that has in it the two -- the new -- at the beginning of this case, we billed

every time there was a blowup. So when there was the blowup over he changed the locks, there was a bunch of billing that went in. The same with the mediation and what have you. That bill that you have there encompasses what was incurred by Ms. Peck in the two failed attempts to overturn the mediated agreement that Major Peck entered into, Your Honor.

And no matter how it's characterized by Mr. Rippy, that's exactly what it was. The Court can read that file. So we would ask for $19,000 in attorney fees, but really, I think we have a strong and legitimate claim for the 4,400 -- for the $4,492 that Ms. Peck paid in dealing with the attempts to overturn the agreement he entered into with a mediator.

So with that, I rest, Your Honor.

MR. RIPPY: No questions for this witness, Judge.

THE COURT: You rest, Mr. Rippy?

MR. RIPPY: We rest and close, Judge.

THE COURT: So both sides close.

All right, lawyers. I don't need any final argument. I believe that what the parties -- what Ms. Peck has in her possession, she keeps. What Major Peck has in his possession, he keeps.

The Court strongly encourages her to elect

to pay the Survivor Benefit because it is measured by her life, not his, but that's an expense that she should share with Major Peck. And I believe that was what I heard him say he was willing to do, which is pretty much -- that goes down the line with what I do in other cases.

The house will be sold. The proceeds will be divided 60 percent to Ms. Peck, 40 percent to Major Peck.

She is driving the Nissan. I will award the Nissan to her. I'm awarding his vehicle to him.

I believe that, regardless of the classification of the property held in the Morgan Stanley account, I'm awarding it in its entirety to him. Regardless of the classification of the property contained in her account that she says is her separate property, I will award entirely to her. The accounts not mentioned are divided 60/40, 60 to Ms. Peck, 40 to Major Peck.

I believe that there is a concession here on the frequent flier miles, which he is saying go entirely to her as they -- of those that currently exist at present.

Each party will pay the credit card debt in their name. Major Peck agreeing to pay that portion

that he has borrowed to make the house payment.

Now, I do not find that Mrs. Peck is disabled. I do find that she is on a very distressing combination of medicine. I do believe that that may be a factor in her employment possibilities as they currently exist. And it might do her well to confer with one physician about her issues, because it's the Court's experience with this particular mixture of medicine causing problems in cases similarly situated to this one.

So for two years from today's date, at which time I am granting their divorce, Major Peck will pay her a total of $2,500 per month. For three years, he will pay her a total of $2,000. At the termination of five years, his alimony obligation ceases.

I believe that he mentioned a weight set and his books and personal items. You may talk to Mr. Rippy about your personal property that you may have.

Mr. Rippy, I need a clarification of those things that Major Peck is asking to be returned to him that are of a personal nature to him. Certainly, his weight set, certainly his books, certainly his personal papers all need to be returned to him. Are there additional things that I missed?

MR. RIPPY: Judge, the short answer is no. The long answer is on her rather detailed list. And in this regard, we appreciate it. The Persian rug and the headboard, which I think are family heirlooms of Major Peck's --

THE COURT: Those need to be returned to him.

MR. RIPPY: I think she agreed to that in her list, but he wanted the Court to be aware of that.

THE COURT: Okay. Those things that belonged to him before he was married to her need to be returned to him.

MR. HINDERA: The Persian rug and what else?

MR. RIPPY: And headboard. And I believe she said in her list that he could have them, but he wanted the Court to be made aware of it.

THE COURT: Now, I don't recall the kind of car she's driving -- or he's driving, but I'm giving that to him.

I'm not awarding any attorneys' fees.

Gentlemen, anything I missed?

Thank you.

MR. HINDERA: Thank you, Your Honor.

(Proceedings concluded.)

REPORTER'S CERTIFICATE

STATE OF TEXAS                    *

COUNTY OF WILLIAMSON     *

I, Virginia L. Bunting, Deputy Court Reporter in and for the County Court at Law No. 4 of Williamson County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested by counsel for the parties in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record truly and correctly reflects the exhibits, if any, offered by the respective parties.

WITNESS MY OFFICIAL HAND on this the <u>18th</u> day of September, 2014.

<u>/s/ Virginia L. Bunting</u>
Virginia L. Bunting, CSR
Texas CSR No. 5704
Expiration Date:  12-31-15
P.O. Box 405
Liberty Hill, Texas  78642
(512) 940-6597

# Exhibit C

REPORTER'S RECORD
VOLUME 9 OF 9 VOLUMES

CAUSE NO. 13-0926-FC4
COURT OF APPEALS NO. 03-14-00440-CV

IN THE MATTER OF           *   IN THE DISTRICT COURT
                           *
THE MARRIAGE OF            *
                           *
NANCY MARIE PECK           *   WILLIAMSON COUNTY, TEXAS
                           *
AND                        *
                           *
WAYNE CODY PECK            *   COUNTY COURT AT LAW NO. 4


EXHIBITS

# RESPONDENT'S EXHIBITS

| NO. | DESCRIPTION | OFFERED | ADMITTED | VOL |
|-----|-------------|---------|----------|-----|
| 1 | W-2 (Wayne Cody Peck) | 40 | 40 | 3 |
| 2 | Last Will and Testament (Milford Peck) | 16 | 16 | 3 |

RESPONDENT'S EXHIBIT NO. 1

| a Employee's social security number | | OMB No. 1545-0008 | | |
|---|---|---|---|---|
| b Employer identification number | d Control number | 1 Wages, tips, other compensation 87404.40 | | 2 Federal income tax withheld 9802.92 |
| c Employer's name, address, and ZIP code DFAS ATTN:DFASIN/JAMBF 8899 EAST 56TH STREET INDIANAPOLIS  IN  46249-2410 | | 3 Social security wages 87404.40 | | 4 Social security tax withheld 5419.07 |
| | | 5 Medicare wages and tips 87404.40 | | 6 Medicare tax withheld 1267.36 |
| | | 7 Social security tips | | 8 Allocated tips |
| e Employee's name, address, and ZIP code WAYNE CODY PECK | | 9 Advance EIC payment | | 10 Dependent care benefits |
| | | 12 See instructions for box 12 | | 14 See instructions for box 14 |

13 ☐ Statutory employee    ☒ Retirement Plan    ☐ Third party sick pay

| 15 State TX | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc | 19 Local income tax | 20 Locality name |

Form **W-2** Wage and Tax Statement **2013**

Department of the Treasury - Internal Revenue Service
Copy B To Be Filed With Employee's FEDERAL Tax Return
This information is being furnished to the Internal Revenue Service

---

| a Employee's social security number | | OMB No. 1545-0008 This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it. | | |
|---|---|---|---|---|
| b Employer identification number | d Control number | 1 Wages, tips, other compensation 87404.40 | | 2 Federal income tax withheld 9802.92 |
| c Employer's name, address, and ZIP code DFAS ATTN:DFASIN/JAMBF 8899 EAST 56TH STREET INDIANAPOLIS  IN  46249-2410 | | 3 Social security wages 87404.40 | | 4 Social security tax withheld 5419.07 |
| | | 5 Medicare wages and tips 87404.40 | | 6 Medicare tax withheld 1267.36 |
| | | 7 Social security tips | | 8 Allocated tips |
| e Employee's name, address, and ZIP code WAYNE CODY PECK | | 9 Advance EIC payment | | 10 Dependent care benefits |
| | | 12 See instructions for box 12 | | 14 See instructions for box 14 |

13 ☐ Statutory employee    ☒ Retirement Plan    ☐ Third party sick pay

| 15 State TX | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc | 19 Local income tax | 20 Locality name |

Department of the Treasury - Internal Revenue Service

Form **W-2** Wage and Tax Statement **2013**

Copy C For EMPLOYEE'S RECORDS (See Notice to Employee on back of Copy B)



Respondent
EXHIBIT NO. 1
3-18-14
V. BUNTING

RESPONDENT'S EXHIBIT NO. 2

VOL **038** PAGE **715**

# Last Will and Testament of

## Milford V. Peck:

## First Codicil

1. I, Milford V. Peck, of Bexar County, Texas, in good mental and physical health make and publish this First Codicil to my Will, which was executed by me on July 1, 1988, in the presence of Karen W. Miller, Maria B. Clark, and Tom Oxford.

2. I hereby amend section 2.0 of my will to read as follows:

> "2.0 PRIMARY BEQUEST. I give to my children Anne Cherly Linn, Jean Marie Howard, Wayne Cody Peck, and Robin Lerlene Peck all of my estate, including the rest, residue and remainder thereof, in equal shares per stirpes. If any of these children fails to survive me as defined herein and does not leave surviving issue, then that deceased child's share shall pass in equal shares to the survivors among Anne Cherly Linn, Jean Marie Howard, Wayne Cody Peck, and Robin Lerlene Peck. This section is subject to the following:"

3. I hereby republish and ratify the remaining provisions of my will, including but not limited to the sub-sections numbered 2.0.1 and 2.0.2.

4. This First Codicil to my Will consists of 2 typewritten pages, including the pages containing the attestation clause and the Self-Proving Affidavit. I have initialed each page for the purpose of identification, all in the presence of the undersigned who witnessed the execution of this First Codicil to my Will at my request, on September 25, 1990.

_____
Milford V. Peck, Testator

Initials: _____

Page 1



Respondent
EXHIBIT NO. 2
3-18-14
V. BUNTING



CERTIFIED TRUE AND CORRECT COPY
STATE OF TEXAS, COUNTY OF BANDERA
The document to which this certificate is affixed consists of 8 of 9 pages, is a full, true and correct copy of the original file and of record in my office.

ATTEST:
GANDY WHITE, District Clerk
BANDERA COUNTY, TEXAS
BY: _____

VOL 038 PAGE 716

This Codicil was, on September 25, 1990, made and published as the First Codicil to the Last Will and Testament of Milford V. Peck, and was signed and subscribed by the Testator, and by each witness in the presence of each other, who hereby sign and subscribe their names hereto as attesting witnesses.

Dorthia Dembo, Witness
7410 Blanco, San Antonio, Tx.

Kathryn L. Reyes,        Witness
7410 Blanco, San Antonio, Tx.

STATE OF TEXAS          §
COUNTY OF BEXAR         §          SELF PROVING AFFIDAVIT

BEFORE ME, the undersigned authority, on this day personally appeared Milford V. Peck, the Testator, and the witnesses whose names are subscribed to the annexed or foregoing instrument, in their respective capacities, and all of said persons being by me duly sworn, the said Milford V. Peck, Testator, declared to me and to the said witnesses in my presence that said instrument is the First Codicil to the Last Will and Testament of the Testator, and that it was willingly made and executed as a free act and deed for the purposes therein expressed; and the said witnesses, each on their oath, stated to me, in the presence and hearing of the said Testator, that the said Testator had declared to them that said instrument is First Codicil to the Last Will and Testament of the Testator, and that it was executed as such and that the Testator wanted each of them to sign it as a witness thereto; and upon their oaths each witness stated further that they did sign the same as witnesses in the presence of the Testator and at the request of Testator; that the Testator was at that time 18 years of age or over and was of sound mind; and that each of said witnesses was then at least 14 years of age.

Milford V. Peck

Witness                          Witness

Subscribed and acknowledged before me by Milford V. Peck, Testator, and subscribed and sworn to before me by Dorthia Dembo and Kathryn L Reyes, the witnesses on September 25, 1990.

Notary Public – State of Texas

PAUL A. PREMACK
Notary Public
STATE OF TEXAS
My Comm. Exp. APR 23, 1993

Prepared by:
PAUL PREMACK, ATTORNEY AT LAW
7410 BLANCO, SUITE 420, SAN ANTONIO, TEXAS 78216
512-366-2222

Initials:

2




CERTIFIED TRUE AND CORRECT COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF BANDERA
The document to which this certificate is affixed matching __9__
of __9__ pages, is a full, true and correct copy of the original on file and of record
in my office.
MAR 17 2014
ATTEST:
CANDY WHEELER, COUNTY CLERK
BANDERA COUNTY, TEXAS
BY _____

NO. 2388-91

IN THE COUNTY COURT

ESTATE OF

OF

MILFORD V. PECK

BANDERA COUNTY, TEXAS

DECEASED

**INVENTORY, APPRAISEMENT, AND LIST OF CLAIMS**
Date of Death: October 28, 1991

The following is a full, true and complete Inventory and Appraisement of all personal property and all real property situated in the state of Texas, together with a List of Claims due and owing to this Estate as of the date of death, which have come to the possession or knowledge of the undersigned.

INVENTORY AND APPRAISEMENT

GROSS ESTATE    DECEDENT'S ESTATE

1.
REAL PROPERTY

A.  3 Village Way, Unit 32
    Fairway Oaks Condominiums,
    Brockton, MA          $ 60,000.00    $ 60,000.00

B.  Lots 23-24, Block 3, Pebble Beach
    Subdivision, Bandera County, Tx
                          $ 65,000.00    $ 65,000.00

C.  Los 7 & 8, Tee and Green Estates
    Charlotte County, Florida
                          $    800.00    $      800.00
          TOTAL     $ 125,800.00    $ 125,800.00

2.
STOCKS AND BONDS

A.  Shearson Lehman Brothers

    Account  ██████████ 6,931.04    $ 56,931.04

    Account  ██████████ 2,424.99    $

B.  Dreyfus Liquid Assets
    IRA Account ██-██████

1

CERTIFIED TRUE AND CORRECT COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF BANDERA
The document to which this certificate is affixed containing 1
of 5 pages, is a full, true and correct copy of the original on
file and of record
in my office.    MAR 18 2014

ATTESTED:
CANDY WHEELER, COUNTY CLERK
BANDERA COUNTY, TEXAS

BY _____

VOL **039** PAGE **458**

|  |  | $ 11,283.83 | $ 11,283.83 |

C.   Fall River Industries, Inc.
     No. N613/25 Shares     $   -0-      $   -0-

            TOTAL     $ 70,639.86    $ 70,639.86

**3.**
**MORTGAGES AND NOTES**           NONE          NONE

**4.**
**CHECKING AND SAVINGS ACCOUNTS**

A.    Broadway National Bank
      Account No. ███████
      Regular Checking
                   $   1,191.21    $   1,191.21

B.    Broadway National Bank
      Account No. 0███████
      Personal Savings
                   $   298.77    $   298.77

C.    Broadway National Bank
      Account No. ███████
      Money Market
                   $   16,393.36    $   16,393.36

D.    Broadway National Bank
      Account 0████
      IRA
                   $   11,071.19    $   -0-

E.    Harlingen National Bank
      Checking Account No. ██████
                   $ 2,0██.79    $   2,087.79

F.    USAA Cornerstone Fund
      Account No. ███████
      IRA
                   $   13,960.10    $   13,960.10

G.    USAA
      Account No. ███████
      High Yield
                   $   23,349.36    $   23,349.36

H.    USAA
      Account No. ███████

2

CERTIFIED TRUE AND CORRECT COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF BANDERA
The document in which this certificate is affixed contains 2
of 5 pages, is a full, true and correct copy of the original on
file and of record
in my office.

MAR 18 2014

ATTESTED:
CANDY WHEELER, COUNTY CLERK
BANDERA COUNTY, TEXAS
BY _____

Money Market         $   3,171.42    $   3,171.42

I.    SAFE
Account No.39372      $   10,978.27   $   10,978.27

        **TOTAL**     $   71,523.20   $   60,452.00

5.
**EMPLOYMENT BENEFITS**     NONE         NONE

6.
**MISCELLANEOUS PROPERTY**

A.   1989 Ford Taurus
     VI #1FABP5248KA264099
                    $   5,500.00   $   5,500.00

B.   Household furnishings,
     tools,    equipment,
     miscellaneous personal property
                    $   7,500.00   $   7,500.00

        **TOTAL**     $   13,000.00   $   13,000.00

7.
**LIFE INSURANCE**

A.   Jefferson Pilot
     Pol. No. PL1278252
     Insured: Milford V. Peck
                  $ 100,000.00   $ 100,000.00

B.   Jefferson Pilot
     Pol No. PL1282272
     Insured: Wayne Cody Peck
                  $   5,387.74   $   -0-

C.   Jefferson Pilot
     Pol. No. PL277437
     Insured: Robin Peck
                  $   5,764.36   $   -0-

        **TOTAL**     $ 111,152.10   $ 100,000.00

| | | |
|---|---|---|
| REAL PROPERTY | $ 125,800.00 | $ 125,800.00 |
| STOCKS AND BONDS | $ 70,639.86 | $ 70,639.86 |
| CHECKING/SAVINGS | $ 71,523.20 | $ 60,452.00 |
| MISCELLANEOUS PROPERTY | $ 13,000.00 | $ 13,000.00 |
| LIFE INSURANCE | $ 111,152.10 | $ 100,000.00 |

3

CERTIFIED TRUE AND CORRECT COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF BANDERA
The document to which this certificate is affixed containing 3 of 38 pages; is a full, true and correct copy of the original on file and of record in my office.

MAR 18 2014

ATTESTED:
CANDY WHEELER, COUNTY CLERK
BANDERA COUNTY, TEXAS

BY:

**VOL 039 PAGE 460**

GROSS ESTATE      $ 392,115.16     $ 369,891.86

LESS,      INDEBTEDNESS  <$  53,223.97     $   53,223.97>
Realty World –Gold Cape Realty
said indebtedness secured by
real property hereinabove
described in 1A above

**NET ESTATE**      $ 338,891.19     $316,667.89

## LIST OF CLAIMS

There are no claims due or owing to the Estate other than those shown on the foregoing Inventory and Appraisement.

The foregoing Inventory, Appraisement, and List of Claims should be approved and ordered of record.

Respectfully submitted,

BY:   Attorney for Estate
K. H.Schneider
P.O. Box 1435
Bandera, Texas   78003
512-796-8400

4

CERTIFIED TRUE AND CORRECT COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF BANDERA
The document to which this certificate is affixed consisting 4
of 5 pages, is a full, true and correct copy of the original on
file and of record
in my office.            MAR 18 2011



ATTESTED:
CANDY WHEELER, COUNTY CLERK
BANDERA COUNTY, TEXAS
BY

VOL **039** PAGE **461**

STATE OF TEXAS

COUNTY OF BANDERA

KNOW ALL MEN BY THESE PRESENTS:

I, **PEGGY ASHMORE**, having been duly sworn, hereby state on oath that the foregoing Inventory, Appraisement, and List of Claims is a true and complete statement of all the property and claims of the Estate that have come to my knowledge.

*Peggy Ashmore*
**PEGGY ASHMORE,**
Independent Executrix

SUBSCRIBED AND SWORN TO BEFORE ME by **PEGGY ASHMORE** on the 1st day of __September__, 1992, to certify which witness my hand and seal of office.

FILED
This ___ Day of Sept. A.D., 1992
At 9:15 O'Clock A. M
*Bernice Bates*
County Clerk, Bandera County, Texas
By *Marilyn Seale* Deputy

_____
Notary Public, State of Texas

**ORDER**

The foregoing Inventory, Appraisement, and List of Claims of the above Estate having been filed and presented and the Court having considered and examined the same and being satisfied that it should be approved and there having been no objections made thereto, it is in all respects APPROVED and ORDERED entered of record.

SIGNED on the 8th day of __September__, 1992.

_____
Judge Presiding

FILED
This ___ Day of Sept A.D. 1992
At 11:15 O'Clock A. M
*Bernice Bates*
County Clerk, Bandera County, Texas
By *Marilyn Seale* Deputy

5



CERTIFIED TRUE AND CORRECT COPY CERTIFICATE
STATE OF TEXAS, COUNTY OF BANDERA
The document to which this certificate is affixed contains 5 of 5 pages, is a full, true and correct copy of the original on file and of record in my office.        MAR 18 20..
ATTESTED:
CANDY WHEELER, COUNTY CLERK
BANDERA COUNTY, TEXAS
BY_____

REPORTER'S CERTIFICATE

STATE OF TEXAS          *

COUNTY OF WILLIAMSON    *

I, Virginia L. Bunting, Deputy Official Court Reporter in and for the County Court At Law No. 4, Williamson County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $1393.50 and was paid by appellee.

WITNESS MY OFFICIAL HAND on this the 22nd day of September, 2014.

/s/Virginia L. Bunting
Virginia L. Bunting, CSR
Texas CSR No. 5704
Expiration Date:  12-31-13
P.O. Box 405
Liberty Hill, Texas  78642
(512) 940-6597